**CORPORATE HEALTH INSURANCE INC., et al.**

v.

**The TEXAS DEPARTMENT OF INSURANCE, et al.**

Civil Action No. H–97–2072.

United States District Court, S.D. Texas, Houston Division.

Sept. 18, 1998.

John Bruce Shely, Andrews and Kurth, Houston, TX, for Corporate Health Insurance Inc., Aetna Health Plans of Texas Inc., Aetna Health Plans of North Texas Inc., Aetna Life Insurance Company.

Harry G. Potter, III, Asst. Atty. General, General Litigation, Austin, TX, George E. Pletcher, Helm Pletcher Bowen & Saunders, Houston, TX, George Parker Young, Frideman Young and Suder, Fort Worth, TX, David C. Mattax, Office of Attorney General, Austin, TX, David Keltner, Jose Henry Brantley & Keltner, Fort Worth, TX, for The Texas Department of Insurance, Elton Bomer.

GILMORE, District Judge.

### ORDER

Pending before the Court are Defendants' motion to dismiss, which has been converted into a motion for summary judgment, (Instrument No. 10), and Plaintiffs' motion for summary judgment, (Instrument No. 20).

Based on the parties' submissions and the applicable law, the Court finds that Defendants' and Plaintiffs' motions should be **GRANTED in PART** and **DENIED in PART**.

### I. Background

Plaintiffs Corporate Health Insurance, Inc., Aetna Health Plans of Texas, Inc., Aetna Health Plans of North Texas, Inc., and Aetna Life Insurance Company bring this action against Defendants Texas Department of Insurance (the "Department") and Elton Bomer ("Bomer"), Commissioner of the Texas Department of Insurance, and Dan Morales ("Morales"), Attorney General of the state of Texas, in their official capacities, seeking declaratory and injunctive relief. Plaintiffs request a declaration that Texas Senate Bill 386, the Health Care Liability Act (the "Act"), codified as TEX. CIV. PRAC. & REM. CODE ANN. §§ 88.001–88.003 (West 1998), and which adds or amends TEX. INS. CODE ANN. arts. 20A.09, 20A.12, 20A.12A, 21.58A, and 21.58C (West 1998), is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. § 1001 et seq. (West 1985 & Supp.1998), and by the Federal Employees Health Benefit Act ("FEHBA"), 5 U.S.C.A. § 8901 et seq. (West 1967 & Supp.1996). Plaintiffs also seek, if necessary, to enjoin the enforcement of the Act as it relates to employee benefit plans covered by ERISA and FEHBA.

The Act allows an individual to sue a health insurance carrier, health maintenance organization, or other managed care entity for damages proximately caused by the entity's failure to exercise ordinary care when making a health care treatment decision. TEX. CIV. PRAC. & REM. CODE ANN. § 88.002(a) (West 1998). In addition, under the Act, these entities may be held liable for substandard health care treatment decisions made by their employees, agents, or representatives. Id. § 88.002(b).[1] The Act also

---

1. The Act provides, in pertinent part, the following:

 § 88.002. Application

 (a) A health insurance carrier, health maintenance organization, or other managed care entity for a health care plan has the duty to exercise ordinary care when making health care treatment decisions and is liable for damages for harm to an insured or enrollee proximately caused by its failure to exercise such ordinary care.

establishes an independent review process for adverse benefit determinations and requires an insured or enrollee to submit his or her claim challenging an adverse benefit determination to a review by an independent review organization if such a review is requested by the managed care entity. *Id.* § 88.003(c). Additional responsibilities for HMOs and further requirements concerning the review of an adverse benefit determination by an independent review organization are also addressed by the Act. *See* TEX. INS. CODE ANN. arts. 20A.09, 20A.12, 20A.12A, 21.58A, and 21.58C (West 1998).

On July 21, 1997, Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and to dismiss Plaintiffs' suit against the Department and Bomer as improper parties. Defendants argue that dismissal is appropriate for the following reasons:

> Senate Bill 386 regulates the quality of care provided by the HMO[s] operating in Texas. ERISA and FEHBA, in contrast, govern what types of regulations may be placed on an employee benefit plan. The plain meaning of the statute shows that the purpose of Senate Bill 386 is to prevent health plans from escaping liability for the medical decisions they "make," "control" or "influence." Senate Bill 386 does not seek to regulate how HMO's make benefit or coverage determinations; nor does it proscribe requirements governing the *structure* of a benefit plan. Accordingly, the ERISA and FEHBA preemption clauses do not apply to Senate Bill 386.

(Defendants' Summary of Argument, Instrument No. 25 at 1). If the Court were to determine that certain provisions of the Act relate to employee welfare benefit plans, Defendants ask this Court to sever any "non-liability" provisions of the Act that it finds to be preempted, saving the valid quality of care liability provisions. (Defendants' Reply,

Instrument No. 24 at 8 n. 3). Defendants also contend that the Eleventh Amendment bars suit against both the Texas Department of Insurance and Bomer because the state of Texas is immune from suit. Furthermore, according to Defendants, there is "a real question" as to whether Elton Bomer is a proper party given the Plaintiffs' allegations in their complaint. (Defendants' Brief, Instrument No. 11 at 38 n. 37).

On July 29, 1997, Plaintiffs filed a motion for summary judgment, contending that the Act "impermissibly interferes with the purpose, structure and balance of ERISA and FEHBA, thereby injecting state law into an area exclusively reserved for Congress." (Plaintiffs' Summary of Argument, Instrument No. 21 at 1). Plaintiffs contend that the language in the Act expressly "refers to" ERISA plans, and that the Act has a connection with ERISA plans because it purports to impose state law liability on ERISA entities and to mandate the structure of plan benefits and their administration. Plaintiffs also maintain that the Act wrongfully binds employers and plan administrators to particular choices and impermissibly creates an alternate enforcement mechanism.

On April 24, 1998, the Court held a hearing on Defendants' motion to dismiss and Plaintiffs' motion for summary judgment. At the hearing, the Court informed the parties that Defendants' motion to dismiss would be converted into a motion for summary judgment. Then, on May 15, 1998, Plaintiffs filed their First Amended Complaint for Declaratory Judgment and Permanent Injunction, adding Morales as a defendant in this case.

## II. 12(b)(6) Motion to Dismiss Standard of Review

Rule 12(b)(6) allows for dismissal if a plaintiff fails "to state a claim upon which relief may be granted[.]" FED. R. CIV. P. 12(b)(6). Such dismissals, however, are rare,

---

(b) A health insurance carrier, health maintenance organization, or other managed care entity for a health care plan is also liable for damages for harm to an insured or enrollee proximately caused by the health care treatment decisions made by its:
(1) employees;
(2) agents;
(3) ostensible agents; or
(4) representatives who are acting on its behalf and over whom it has the right to exercise influence or control or has actually exercised influence or control which result in the failure to exercise ordinary care.

TEX. CIV. PRAC. & REM. CODE ANN. §§ 88.002(a) and (b) (West 1998).

*Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir.1986), and only granted where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–6, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Dismissal can be based either on a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. 851 F.Supp. 254, 259 (N.D.Tex.1994).

■ In determining whether a dismissal is warranted pursuant to Rule 12(b)(6), the Court accepts as true all allegations contained in the plaintiffs complaint. *Gargiul v. Tompkins,* 704 F.2d 661, 663 (2d Cir.1983), *vacated on other grounds,* 465 U.S. 1016, 104 S.Ct. 1263, 79 L.Ed.2d 670 (1984); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982). In addition, all reasonable inferences are to be drawn in favor of the plaintiff's claims. *Kaiser Aluminum,* 677 F.2d at 1050. "To qualify for dismissal under Rule 12(b)(6), a complaint must on its face show a bar to relief." *Clark,* 794 F.2d at 970.

■ If the court, in its discretion, accepts for consideration matters that are beyond the pleadings then the motion to dismiss is converted into a motion for summary judgment under Rule 12(b). Rule 12(b) states, in pertinent part, that:

> [i]f, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. . . .

FED. R. CIV. P. 12(b). A court is more likely to consider matters outside the pleadings if the "'extra-leading material is comprehensive and will enable a rational determination of a summary judgment motion[.]'" *Isquith for and on Behalf of Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 193 n. 3 (5th Cir.1988) (quoting 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366 (1969)). However, the Court is unlikely to do so when it is scanty, incomplete, or inconclusive. *Id.*

■ The court must give all parties notice of such a conversion and provide them with an opportunity both to be heard and to present further materials in support of their positions on the motion. *Nowlin v. Resolution Trust Corp.,* 33 F.3d 498, 504 (5th Cir.1994). Following conversion, the court should permit the parties to engage in discovery as appropriate before ruling on the converted motion. *Washington v. Allstate Ins. Co.,* 901 F.2d 1281 (5th Cir.1990).

In this case, having received for consideration matters that are beyond the pleadings of the parties such as affidavits, contracts for health benefit plans, and statistical data, the Court will convert Defendants' motion to dismiss into a motion for summary judgment. Given that Plaintiffs subsequently filed a motion for summary judgment on the same issues, Plaintiffs have received ample notice that the case may be decided at this stage on the merits. Furthermore, at the motions hearing held on April 24, 1998, the Court informed the parties of its intention to convert Defendants' motion into a motion for summary judgment. The parties also had an additional opportunity to be heard at the hearing and to present any additional evidence. Thus, both parties had sufficient notice of the conversion.

### III. Summary Judgment Standard

■ Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *Id.* at 249–50, 106 S.Ct. at 2511; *see Lewis v. Glendel Drilling Co.,* 898 F.2d 1083, 1088 (5th Cir.1990).

Under Rule 56(c) of the Federal Rules of Civil Procedure, the moving party bears the initial burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial and for identifying those portions of the record that demonstrate such absence. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir.1987).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting FED. R. CIV. P. 56(e)) (emphasis in original); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Leonard*, 828 F.2d at 294. To sustain the burden, the nonmoving party must produce evidence admissible at trial. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2514; *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir.1992) ("To avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue ...").

## IV. Improper Parties

Defendants argue that the Department and Bomer are improper parties to this suit. (Defendants' Motion, Instrument No. 10 at 10; Defendants' Reply, Instrument No. 24 at 10). First, Defendants contend that the Eleventh Amendment bars suit against both parties. The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state or by citizens or subject of any foreign state." U.S.CONST. amend. XI. In addition, the Eleventh Amendment "bars suit against a state entity ... regardless of whether money damages or injunctive relief is sought. In determining whether an entity is entitled to ... immunity, [the court] ... 'must examine the particu-

lar entity in question and its powers and characteristics as created by state law....'" *Voisin's Oyster House, Inc. v. Guidry*, 799 F.2d 183, 186 (5th Cir.1986) (quoting *Laje v. R.E. Thomason Gen. Hosp.*, 665 F.2d 724, 727 (5th Cir.1982)).

■ Several factors are considered in determining whether an agency is an arm of the state including: (1) whether state statutes and case law view the agency as an arm of the state; (2) the source of the entity's funding; (3) whether the entity is concerned with local or statewide problems; (4) the degree of the agency's authority which is independent from the state; (5) whether the entity can sue and be sued in its own name; and (6) whether it has the right to hold and use property. *Guidry*, 799 F.2d at 186–87. "Positive answers to the latter two inquiries mitigate against an entity's being an alter ego of the State and thus against Eleventh Amendment immunity." *Correa v. City of Bay City*, 981 F.Supp. 477, 479 (S.D.Tex. 1997).

■ The Department is clearly a state agency, created by the laws of the state of Texas. *See* TEX. INS. CODE ANN. art. 1.01 *et seq.* (West 1998); *El Paso Elec. Co. v. Texas Dep't of Ins.*, 937 S.W.2d 432, 434 (Tex.1996). Its primary responsibility is "to regulate the business of insurance in this state." TEX. INS. CODE ANN. art. 1.01A (West 1998). The Department is in the executive branch of the state government, and is controlled by an executive officer, the Commissioner, who is appointed by the Department with the advice and consent of the Senate of Texas. *Id.* art. 1.09. Several members of the Department, such as deputies, assistants, and other personnel, are appointed by the Commissioner. *Id.* art. 1.02. All of the above factors favor a finding that the Department is an arm of the State of Texas and therefore entitled to Eleventh Amendment immunity. *See Correa*, 981 F.Supp. at 479. Consequently, the Court **DISMISSES** the Department from this lawsuit.

■ With respect to state officials, "'a gaping hole in the shield of sovereign immunity created by the [E]leventh [A]mendment and the Supreme Court' is the doctrine" of

*Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *Saltz v. Tennessee Dep't of Employment Sec.,* 976 F.2d 966, 968 (5th Cir.1992) (quoting *Brennan v. Stewart,* 834 F.2d 1248, 1252 (1988)). Under the *Ex Parte Young* doctrine, "a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury." *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979). "The essential ingredients of the *Ex Parte Young* doctrine are that a suit must be brought against individual persons in their official capacities as agents of the state and the relief sought must be declaratory or injunctive in nature and prospective in effect." *Saltz,* 976 F.2d at 968 (footnote omitted); *see also CIGNA Healthplan of La. v. State of Louisiana,* 82 F.3d 642, 644 n. 1 (5th Cir. 1996) (recognizing "the federal courts have jurisdiction to hear suits against state officials where, as here, the plaintiffs seek only prospective declaratory or injunctive relief to prevent a continuing violation of federal law").

In this case, Plaintiffs have sued Bomer in his official capacity and also seek prospective injunctive relief, not monetary damages. Therefore, Defendants' argument that suit against Bomer is barred by the Eleventh Amendment fails.

█ Second, Defendants argue that "[t]here may be a real question whether Commissioner Bomer is a proper party" based on the Plaintiffs' allegations in their complaint. (Defendants' Brief, Instrument No. 11 at 38 n. 37). According to Defendants, Plaintiffs' "only allegation ... [regarding Bomer's] official administrative capacity ... [concerns] his responsibility for enforcing state insurance law. The only role for the Commissioner in Senate Bill 386 is to approve IROs (independent review organization) and it is very unclear whether ... [Plaintiffs are] alleging [that] the IRO procedures are preempted." (*Id.* at 38 n. 37). In response, Plaintiffs maintain that Bomer is a proper party to this suit because as the Commissioner, Bomer "is responsible for en-

suring compliance with ... the establishment and supervision of independent review organizations." (Plaintiffs' Motion, Instrument No. 20 at 5). The Court agrees with Plaintiffs' contention.

Clearly, Plaintiffs contest the inclusion of the IRO provisions in the Act. In particular, Plaintiffs state that the "IRO procedure improperly affects the administration of employee benefit plans, and is therefore an unwarranted extension into an area governed by ERISA.... As such, either directly or indirectly, HMOs and PPOs will incur costs in connection with the establishment of IROs under the Act, thereby also supporting a finding of preemption." (Plaintiffs' Motion, Instrument No. 20 at 17 n. 17). Plaintiffs elaborated on this position at the hearing held on April 24, 1998. (Transcript, Instrument No. 60 at 21). Furthermore, Defendants concede that Bomer, as the Commissioner, is responsible for approving the IRO procedure. (Defendants' Brief, Instrument No. 11 at 38 n. 37).

Moreover, Defendants do not provide the Court with any authority for their proposition that Bomer is an improper party to this suit. On the contrary, the Commissioner of the Texas Board of Insurance has been named as a defendant in other cases similar to the instant case. *See NGS Am., Inc. v. Barnes,* 998 F.2d 296 (5th Cir.1993) (enjoining the Commissioner of Insurance for the state of Texas from enforcing a Texas statute that was preempted by ERISA); *E–Systems, Inc. v. Pogue,* 929 F.2d 1100 (5th Cir.1991) (holding that the Texas Administrative Services Tax Act was preempted by ERISA and enjoining the Commissioner of Insurance from collecting the tax); *Texas Commerce Bancshares, Inc. v. Barnes,* 798 F.Supp. 1286 (W.D.Tex.1992) (examining plaintiff's award of attorney fees and costs in ERISA preemption action filed against the Commissioner of Insurance). Consequently, given Bomer's role with the IRO procedure and other cases where the Commissioner has been named as a defendant, the Court finds that Bomer is a proper party to this suit.

**V. Insurance Savings Clause**

█ Plaintiffs claim that the Act is preempted by ERISA. Thus, as an initial

matter, the Court will examine whether the Act is saved from preemption by ERISA's insurance savings clause.

ERISA provides that "nothing in this title shall be construed to exempt or relieve any person from any law of any State which regulates *insurance,* banking or securities." 29 U.S.C.A. § 1144(b)(2)(a) (West 1985) (emphasis added). The Supreme Court "delineated the requirements that a state statute must meet in order to come within the insurance facet of the savings clause" in *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 741–47, 105 S.Ct. 2380, 2389–93, 85 L.Ed.2d 728 (1985). The Supreme Court in Metropolitan Life took the following conjunctive two-step approach:

> First, the [C]ourt determined whether the statute in question fitted the common sense definition of insurance regulation. Second, it looked at three factors: (1)[w]hether the practice (the statute) has the effect of spreading policyholders' risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry. If the statute fitted the common sense definition of insurance regulation and the court answered "yes" to *each* of the questions in the three part test, then the statute fell within the savings clause exempting it from ERISA preemption.

*Tingle v. Pacific Mut., Ins. Co.,* 996 F.2d 105, 107 (5th Cir.1993) (footnote omitted) (emphasis added). Therefore, "if a statute fails either to fit the common sense definition of insurance regulation or to satisfy any one element of the three-factor *Metropolitan Life* test, then the statute is not exempt from preemption by the ERISA insurance savings clause." *CIGNA,* 82 F.3d at 650.

When the Court begins to apply this test to the Act, it can both start and finish its analysis with the third factor of the *Metropolitan Life* test: on its face, the Act is obviously not "limited to entities within the insurance industry." Even though the Act lists health insurance carriers as one group covered by its terms, it also specifies that it applies to health maintenance organizations or other managed care entities for a health care plan. TEX. CIV. PRAC. & REM. CODE ANN. § 88.002(a) (West 1998). As the Act fails to meet the third factor of the *Metropolitan Life* test, the Court finds that the statute is not saved from preemption by the insurance exception of Section 514(b) of ERISA. *See CIGNA,* 82 F.3d at 650 (holding that Louisiana's Any Willing Provider statute was not exempt from preemption by ERISA's savings clause because the statute was not limited to entities within the insurance industry).

## VI. ERISA Preemption

Having determined that the Act is not saved by the insurance savings clause, the Court must next examine whether the Act is preempted by Section 514(a) of ERISA.

■ Section 514(a) governs the preemption of state laws by ERISA. More specifically, Section 514(a) provides that ERISA "shall supersede any and all State laws insofar as they ... *relate to any employee benefit plan ....*" 29 U.S.C.A. § 1144(a) (West 1985) (emphasis added). Under ERISA preemption analysis, a state law relates to an ERISA plan if it has a connection with or reference to such a plan. *CIGNA,* 82 F.3d at 647.

■ If the Court determines that certain portions of a state statute are preempted by ERISA and therefore, contravene federal law, then the Court may sever those portions from the statute provided that their invalidity does not affect the remainder of the statute. *Texas Pharmacy Ass'n v. Prudential Ins. Co. of Am.,* 105 F.3d 1035, 1039 (5th Cir.1997). The Court's decision to sever a statute is also based on whether or not that state statute has a provision for severability or nonseverability. *Id.*

Since pre-emption turns on Congress's intent, the court must begin "with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655, 115 S.Ct. 1671, 1676, 131 L.Ed.2d 695 (1995). "A facial challenge to a legislative Act is, of course, the most difficult challenge

to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *U.S. v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). Thus, in this case, the Court must determine whether any claims brought under the Act would relate to an employee benefit plan and would, therefore, be preempted by Section 514(a) of ERISA.

## A. What is an ERISA Plan?

■ First, the Court must examine what constitutes an ERISA plan. An employee welfare benefit plan (which includes health benefits plans), is defined as:

any *plan, fund, or program* which was heretofore or is hereafter *established or maintained by an employer or by an employee organization, or by both* to the extent that such plan, fund, or program was established or is maintained for *the purpose of providing for its participants or their beneficiaries,* through the purchase of insurance or otherwise, (A) *medical, surgical, or hospital care or benefits,* or benefits in the event of sickness, accident, disability....

29 U.S.C.A. § 1002(1) (West Supp.1998) (emphasis added). The first phrase—plan, fund, or program—has been interpreted as requiring an "ongoing administrative program" on the part of the employer. *See Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11, 107 S.Ct. 2211, 2217, 96 L.Ed.2d 1 (1987). A "plan, fund, or program" under ERISA is established if "from the surrounding circumstances a reasonable person can ascertain the intended benefits, class of beneficiaries, the source of financing, and the procedures for receiving benefits." *Donovan v. Dillingham,* 688 F.2d 1367, 1371, 1373 (11th Cir.1982); *see Peckham v. Gem State Mut. of Utah,* 964 F.2d 1043, 1047–48 (10th Cir.1992). The administrative program, however, need not be elaborate. *Peckham,* 964 F.2d at 1048.

The second phrase of the definition—established or maintained by an employer—is designed to distinguish situations in which the employer merely acts as a conduit for the marketing of an insurance policy to individual employees (in which case no ERISA plan exists), from the situation in which the employer financially pays for some or all of the plan and/or otherwise is involved in its administration (e.g. defining and administering employee eligibility, or listing the plan as a benefit of employment).

RAND ROSENBLATT, LAW AND THE AMERICAN HEALTH CARE SYSTEM 190 (Supp.1998). In particular, this second phrase is designed to "ensure that the plan is part of an employment relationship.... [This] requirement seeks to ascertain whether the plan is part of an employment relationship by looking at the degree of participation by the employer in the establishment or maintenance of the plan." *Peckham,* 964 F.2d at 1049.

■ In *Meredith v. Time Ins. Co.,* 980 F.2d 352, 355 (5th Cir.1993), the Fifth Circuit outlined its "comprehensive test for determining whether a particular plan qualifies as an 'employee welfare benefit plan' " under ERISA. Under *Meredith,* the test requires the full analysis of

whether a plan: (1) exists; (2) falls within the safe-harbor provision established by the Department of Labor; and (3) satisfies the primary elements of an ERISA "employee benefit plan"—establishment or maintenance by an employer intending to benefit employees. If any part of the inquiry is answered in the negative, the submission is not an ERISA plan.... [The Court's] analysis is informed by reference to ERISA itself, including germane indications of congressional intent, and to the extent Congress has failed to state its intention on the precise issue in question, we refer to permissible interpretations by the agency charged with administering the statute—the Department of Labor.

*Id.* Furthermore, ERISA does not regulate "bare purchases of health insurance where ... the purchasing employer neither directly or indirectly owns, controls, administers or assumes responsibility for the policy or its benefits." *Taggart Corp. v. Life & Health Benefits Admin., Inc.,* 617 F.2d 1208, 1211 (5th Cir.1980). Thus, in this case, the Court must determine whether the provisions of the Act relate to any employee benefit plan as defined by *Meredith.*

In this case, Defendants make the following argument:

[Plaintiff] AEtna blurs the distinction between an ERISA plan (established by an employer to provide benefits to an employee) and a health plan (established by health insurance entities as a vehicle for bearing the risks of health insurance and providing coverage to an ERISA plan for those employees). AEtna admits plaintiffs 'offer products in the form of managed health care coverage to employees who are enrolled in ERISA and FEHBA plans in Texas.' AEtna may operate as a 'health plan,' but AEtna is not an ERISA plan established by an employer.

(Defendants' Reply, Instrument No. 24 at 1). In essence, Defendants argue that Plaintiffs are operating health plans, but that they are not operating ERISA plans that would be preempted by ERISA. The Court agrees.

The Act expressly regulates health insurance carriers, health maintenance organizations and managed care entities by specifically addressing their health plans and not the ERISA plans of employers. Under the Act, "[a] health insurance carrier, health maintenance organization, or other managed care entity for a health care plan has the duty to exercise ordinary care when making health care treatment decisions and is liable for harm to an insured or enrollee proximately caused by its failure to exercise such ordinary care." TEX. CIV. PRAC. & REM. CODE ANN. § 88.002(a) (West 1998). A health insurance carrier "means an authorized insurance company that issues policies of accident and sickness" under Article 3.70–1 of the Texas Insurance Code. TEX. CIV. PRAC. & REM. CODE ANN. § 88.001(6) (West 1998). A health maintenance organization includes "organization[s] licensed under the Texas Health Maintenance Organization Act[.]" Id. § 88.001(7). A managed care entity under the Act is defined as

any entity which delivers, administers, or assumes risk for health care services with systems or techniques to control or influence the quality, accessibility, utilization, or costs and prices of such services to a defined enrollee population, *but does not include an employer purchasing coverage or acting on behalf of its employees or the employees of one or more subsidiaries or affiliated corporations of the employer* or a pharmacy licensed by the State Board of Pharmacy.

*Id.* § 88.001(8) (emphasis added).

The health plans provided by health insurance carriers, health maintenance organizations, or managed care entities, as previously defined, and the health care entities themselves cannot constitute ERISA plans because the third inquiry under the Fifth Circuit's test—whether the plan satisfies the primary elements of an ERISA "employee benefit plan"—must be answered in the negative. Plaintiffs admit that they "offer products in the form of managed health care coverage to employees who are enrolled in ERISA and FEHBA plans in Texas." (Plaintiffs' Motion, Instrument No. 20 at 3). Plaintiffs and the coverage provided by them, however, are not established or maintained by an employer.

Plaintiffs concede that they fall "within the term 'managed care entity' as defined in the Act[.]" (*Id.* at 4). A managed care entity does not include "an employer purchasing coverage or acting on behalf of its employees[.]" TEX. CIV. PRAC. & REM. CODE ANN. § 88.001(8) (West 1998). Therefore, by definition, Plaintiffs and the managed health care plans that Plaintiffs offer would not satisfy the primary elements of an ERISA employee benefit plan because they are not established or maintained by an employer. Rather, Plaintiffs are medical service providers to ERISA plans and their members.[2] Plaintiffs operate health plans rather than ERISA employee benefit plans. Consequently, the Court finds that Plaintiffs and the particular arrangement or services provided by them, that are addressed under the Act, are not ERISA employee benefit plans since the coverage is not established or maintained by an employer. *See CIGNA*, 82 F.3d at 648 (recognizing that Plaintiffs, an HMO and a

---

2. At the hearing held on April 24, 1998, Mr. John B. Shely, counsel for Plaintiffs, argued that Plaintiffs "provide various services to employee benefit plans that are ERISA plans." (Transcript, Instrument No. 60 at 6).

health insurer, were not ERISA plans); *Washington Physicians Serv. Ass'n v. Gregoire,* 147 F.3d 1039, 1043 (9th Cir.1998) (stating that the statute makes it clear that the term "health plans" "refers to the plan offered by the health carrier (e.g., an HMO), not the benefit plan offered by the employer"); *Dukes v. U.S. Healthcare,* 57 F.3d 350, 356 (3d Cir.1995) (noting the Department of Labor's argument that plaintiff's claims merely attacked "the behavior of an entity completely external to the ERISA plan[,] [the HMO]").

Nonetheless, Plaintiffs argue that the fact that Aetna is not an ERISA health plan is of "no significance to the preemption analysis." (Plaintiffs' Surreply, Instrument No. 33 at 1). Plaintiffs rely on *CIGNA Healthplan of La., Inc. v. State of Louisiana,* 82 F.3d 642 (5th Cir.1996), for this argument.

In *CIGNA,* CIGNA Healthplan of Louisiana ("CIGNA"), a licensed HMO, and Connecticut General Life Insurance Company ("CGLIC"), a licensed health insurer, filed suit against Richard Ieyoub, the Attorney General of the state of Louisiana, seeking a declaratory judgment that Louisiana's Any Willing Provider statute was preempted by ERISA. 82 F.3d at 644. "The Any Willing Provider statute ... mandate[d] that [n]o licensed provider ... who agree[d] to the terms and conditions of the preferred provider contract ... [could] be denied the right to become a preferred provider.'" *Id.* at 645 (quoting LA. REV. STAT. ANN. § 40:2202(5)(c) (West 1992)). The Fifth Circuit concluded that the statute was preempted by ERISA both because it referred to ERISA-qualified plans by including certain enumerated entities, and because it had a connection with such plans by mandating that "certain benefits available to ERISA plans ... be construed in a particular manner." *Id.* at 648–49.

Since the Court found that the statute in *CIGNA* directly affected benefits provided under the plan, the Court did not have to examine whether or not CIGNA or CGLIC was an ERISA plan. Rather, the Court based its decision on the substantial effect that the statute had on all insured plans. *Id.* at 648. The Court, however, did remark that

the fact that CIGNA and CGLIC were not themselves ERISA plans was inconsequential. *Id.* at 648. It made this statement while discussing the statute's "connection with" ERISA plans. *Id.* The Court further explained that CIGNA's and CGLIC's status was inconsequential because:

> [b]y denying insurers, employer, and HMOs the right to structure their benefits in a particular manner, the statute [wa]s effectively requiring ERISA plans to purchase benefits of a particular structure when they contract with organizations like CIGNA and CGLIC. In that regard, the statute "b[ore] indirectly but substantially on all insured plans" and [wa]s accordingly preempted by ERISA.

*Id.* at 648–49 (quoting *Metropolitan Life,* 471 U.S. at 739, 105 S.Ct. at 2389).

In accordance with *CIGNA,* the Court finds that whether or not Plaintiffs in this case are ERISA plans is inconsequential because, under current Fifth Circuit law, certain severable provisions of the Act, as discussed below, "relate to" ERISA employee benefit plans.

### B. "Relates To" Analysis

A state law relates to an ERISA plan "in the normal sense of the phrase if it has a *connection with or reference to* such a plan." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–2900, 77 L.Ed.2d 490 (1983) (emphasis added). The Supreme Court has given the phrase "relates to" a "broad common-sense meaning." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 47, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987). Under this definition,

> A state law can relate to an ERISA plan even if that law was not specifically designed to affect such plans, and even if its effect is only indirect. If a state law does not expressly concern employee benefit plans, it will be preempted insofar as it applies to benefit plans in particular cases....

*CIGNA,* 82 F.3d at 647. "The most obvious class of pre-empted state laws are those that are specifically designed to affect ERISA-governed employee benefits plans." *Corcor-*

*an v. United HealthCare, Inc.,* 965 F.2d 1321, 1328 (5th Cir.1992).

In determining whether a state law "relate[s] to" an ERISA plan, the Supreme Court has adopted a pragmatic approach. *See Travelers,* 514 U.S. at 654–57, 115 S.Ct. at 1676–77. In *Travelers,* the Court stated that it "must go beyond the unhelpful text [of Section 514(a) ] and the frustrating difficulty of defining its key term ['relates to'], and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive [preemption]." 514 U.S. at 656, 115 S.Ct. at 1677.

As stated by the Court in *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* in passing Section 514,

> Congress intended 'to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burdens of complying with conflicting directives among States or between States and the Federal Government ..., [and to prevent] the potential for conflict in substantive law ...
>
> requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.'

514 U.S. at 656, 115 S.Ct. at 1677 (quoting *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 142, 111 S.Ct. 478, 484, 112 L.Ed.2d 474 (1990)). Therefore, "[t]he basic thrust of ... [ERISA's] pre-emption clause ... was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." *Travelers,* 514 U.S. at 657, 115 S.Ct. at 1677–78.

█ Although the text of Section 514(a) is clearly expansive, in so far as it affects all state laws that relate to ERISA plans, the phrase "relate[s] to" does not "extend to the furthest stretch of its indeterminacy[.]" *Id.* at 655, 115 S.Ct. at 1677. If that were the case, "then for all practical purposes preemption would never run its course" and courts would be required "to read Congress's words of limitation as mere sham, and to read the presumption against preemption out of the law whenever Congress speaks to the

matter with generality." *Id.* Thus, in particular, ERISA's "relate[s] to" language was not "intended to modify 'the starting presumption that Congress does not intend to supplant state law' " which falls within areas of traditional state regulation. *De Buono v. NYSA–ILA Med. & Clinical Servs. Fund,* 520 U.S. 806, ——, 117 S.Ct. 1747, 1751–52, 138 L.Ed.2d 21 (1997) (quoting *Travelers,* 514 U.S. at 654–55, 115 S.Ct. at 1676).

█ "The historic powers of the State include the regulation of matters of health and safety." *De Buono,* 520 U.S. at ——, 117 S.Ct. at 1751–52 (citing *Hillsborough County, Fla. v. Automated Med. Laboratories, Inc.,* 471 U.S. 707, 716, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985)). The Act, in this case, regulates the medical decisions of health insurance carriers, health maintenance organizations, and other managed care entities, *see* TEX. CIV. PRAC. & REM. CODE ANN. § 88.002 (West 1998), and therefore, clearly operates in a field that has been traditionally occupied by the States. "[W]here federal law is said to bar state action in fields of traditional state regulation," this Court should work on the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Travelers,* 514 U.S. at 654–55, 115 S.Ct. at 1676 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Consequently, Plaintiffs "bear the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.' " *De Buono,* 520 U.S. at ——, 117 S.Ct. at 1752.

### 1. "Reference To"

█ Under the "reference to" inquiry, the Supreme Court has "held preempted a law that 'impos[ed] requirements by reference to [ERISA] covered programs,' ... a law that specifically exempted ERISA plans from an otherwise generally applicable garnishment provision, ... and a common-law cause of action premised on the existence of an ERISA plan." *California Div. of Labor Standards Enforcement v. Dillingham*

*Constr. N.A., Inc.,* 519 U.S. 316, ——, 117 S.Ct. 832, 837–38, 136 L.Ed.2d 791 (1997) (citations omitted) (quoting *District of Columbia v. Greater Washington Bd. of Trade,* 506 U.S. 125, 131, 113 S.Ct. 580, 584, 121 L.Ed.2d 513 (1992)). Thus, "[w]here a State's law acts immediately and exclusively upon ERISA plans … or where the existence of ERISA plans is essential to the law's operation … that 'reference' will result in pre-emption." *Dillingham,* 519 U.S. at ——, 117 S.Ct. at 838.

■■ In *Travelers,* the Supreme Court examined New York statutes that imposed "surcharges on bills of patients whose commercial insurance coverage [wa]s purchased by employee health-care plans governed by ERISA and … on HMOs insofar as their membership fees … [were] paid by an ERISA plan." 514 U.S. at 649, 115 S.Ct. at 1673–74. Notably, the surcharge on HMOs was "not an increase in the rates to be paid by an HMO to a hospital, but a direct payment by the HMO to the State's general fund." *Id.* at 650, 115 S.Ct. at 1674. The Court held that the "surcharge statutes … [could not] be said to make 'reference to' ERISA plans in any manner" because the surcharges were "imposed upon patients and HMOs, regardless of whether the commercial coverage or membership, respectively, [wa]s ultimately secured by an ERISA plan, private purchase, or otherwise[.]" *Id.* at 656, 115 S.Ct. at 1677.

Similarly, in this case, the Act imposes a standard of ordinary care directly upon health insurance carriers and health maintenance organizations when making health care treatment decisions, regardless of whether the commercial coverage or membership therein is ultimately secured by an ERISA plan. *See* Tex. Civ. Prac. & Rem. Code

§ 88.001–88.002 (West 1998). The Act also requires managed care entities to exercise ordinary care when making medical decisions. *Id.* § 88.002(a). However, as already mentioned, the Act specifically excludes ERISA plans from the definition of a "managed care entity." *See id.* § 88.001(8). Section 88.001(8) of the Texas Civil Practice and Remedies Code, as added by the Act, provides that a "managed care entity" does not include "an employer purchasing coverage or acting on behalf of its employees." *Id.* Consequently, as in *Travelers,* the Act cannot be said to make any reference to ERISA plans.

Plaintiffs, however, maintain that preemption is mandated because the Act has an express reference to ERISA plans in several other provisions. (Plaintiffs' Motion, Instrument No. 20 at 7). In particular, Plaintiffs seem to argue that the mere inclusion of certain terms that allegedly refer to ERISA plans, such as "plan," "health care plan," "health maintenance organization," and "managed care entity," warrants preemption. (Plaintiffs' Motion, Instrument No. 20 at 7–9). Plaintiffs rely on *District of Columbia v. Greater Washington Bd. of Trade,* 506 U.S. 125, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992), and *CIGNA* for this proposition.[3]

In *Greater Washington,* 506 U.S. at 130, 113 S.Ct. at 583, the Supreme Court determined that "Section 2(c)(2) of the District's Equity Amendment Act specifically refer[red] to welfare benefit plans regulated by ERISA and on that basis alone [wa]s preempted." Section 2(c)(2) of the Equity Amendment Act provided the following: "Any employer who provides health insurance coverage for an employee shall provide health insurance equivalent to the *existing health insurance coverage* of the employee while the employee receives or is eligible to

---

**3.** Plaintiffs also claim that the Fifth Circuit's opinion in *Texas Pharmacy Ass'n v. Prudential Ins. Co. of Am.,* 105 F.3d 1035 (5th Cir.1997), mandates a finding that the Act "refers to" ERISA plans. However, in *Texas Pharmacy,* the Court never discussed the "reference to" or "refers to" analysis. *See id.* at 1037. Rather, the Court simply concluded that the "Texas statute relate[d] to ERISA plans because it 'eliminate[d] the choice of one method of structuring benefits,' by prohibiting plans from contracting with pharmacy networks that exclude any willing provid-

er." *Id.* Thus, the Court found that Texas's Any Willing Provider statute had a "connection with" ERISA plans. *Id.*

The Court also mentioned that the statute applied to ERISA benefits plans themselves because it defined "managed care providers to include HMOs, PPOs or 'another organization' that provide[d] health care benefits." *Id.* at 1038. Notably, the Court emphasized the phrase "another organization" as the entity that could conceivably constitute an ERISA plan. *Id.*

receive workers' compensation benefits under this chapter." *Id.* at 128, 113 S.Ct. at 582 (quoting D.C. CODE ANN. § 36–307(a–1)(1) (Supp.1992) (emphasis added)). Furthermore, the employer had to provide this health insurance coverage for a maximum of 52 weeks "at the same benefit level that the employee had at the time the employee received or was eligible to receive workers' compensation benefits." *Id.* (quoting D.C. CODE ANN. § 36–307(a–1)(3) (Supp.1992)). Thus, the health insurance coverage required of employers was "measured by *reference to* 'the existing health insurance coverage' provided by the employer" and had to be maintained at the same benefit level. *Id.* at 130, 113 S.Ct. at 583–84 (emphasis added) (quoting D.C. CODE ANN. § 36–307(a–1)(1) and (3) (Supp.1992)).

The Court then determined that "[t]he employee's 'existing health insurance coverage,' in turn, [wa]s a welfare benefit plan under ERISA ... because it involv[ed] a fund or program maintained by an employer for the purpose of providing health benefits for the employee 'through the purchase of insurance or otherwise.'" *Id.* at 130, 113 S.Ct. at 584 (quoting 29 U.S.C. § 1002(1)). Thus, since the Equity Amendment Act imposed requirements by *reference to* such employer-sponsored health insurance programs that were subject to ERISA regulation, the Court concluded that the Act was preempted by ERISA. *Id.* at 130–31, 113 S.Ct. at 584.

Contrary to Plaintiffs' contention, in *Greater Washington,* the Supreme Court did not conclude that the statute referred to ERISA plans simply because it contained certain terminology. Rather, as explained in *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. at ——, 117 S.Ct. at 838, the Court reasoned that the reference to ERISA plans resulted in preemption because the existence of ERISA plans was essential to the statute's operation.[4] Unlike the statute in *Greater Washington,* the Act is not premised on the existence of an ERISA plan. It merely requires health insurance carriers, HMOs, and other managed care entities to exercise ordinary care when making medical decisions. The Act imposes this standard on these entities without any reference to or reliance on an ERISA plan.

In *CIGNA,* 82 F.3d at 645–47, the Fifth Circuit held that Louisiana's Any Willing Provider statute was preempted by ERISA because it referred to ERISA-qualified plans. The statute required all licensed providers "who agre[ed] to the terms and conditions of the *preferred provider contract*" to be accepted as providers in the preferred provider organization ("PPO"). LA. REV. STAT. ANN. § 40:2202(5)(c) (West 1992) (emphasis added). Under the Health Care Cost Control Act, a "preferred provider contract" was defined as "an agreement 'between a provider or providers and a *group purchaser* or purchasers to provide for alternative rates of payment specified in advance for a defined period of time.'" *CIGNA,* 82 F.3d at 647–48 (quoting LA. REV. STAT. ANN. § 40:2022(5)(a) (emphasis added)).

The Fifth Circuit then examined the definition of "group purchasers." Under the statute, group purchasers may have included entities "such as 'Taft–Hartley trusts or employers who establish or participate in self funded trusts or programs,' which '*contract [with health care providers]for the benefit of their* ... *employees.*'" *CIGNA,* 82 F.3d at 648 (quoting LA. REV. STAT. ANN. § 40:2022(5)(a) (emphasis added)). Since the entities encompassed by the term "group purchasers" included ERISA plans, the Court determined that Louisiana's Health Care Cost Control Act, "and through it the Any Willing Provider statute, expressly refer[red] to ERISA plans." *Id.*

---

4. The Supreme Court reached the same conclusion in *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). In *Ingersoll–Rand,* the Court held that a Texas wrongful discharge claim made "specific *reference to,* and indeed [wa]s premised on, the existence of a pension plan." *Id.* at 140, 111 S.Ct. at 483 (emphasis added). In order to prevail on this wrongful discharge claim, plaintiff had to plead and the court had to find "that an ERISA plan exist[ed] and the employer had a pension-defeating motive in terminating the employment." *Id.* Therefore, since the Court's inquiry had to be "directed to the [ERISA] plan," the Court found that the cause of action "relat[ed] to" an ERISA plan. *Id.*

Unlike the statute in *CIGNA,* the requirement imposed by the Act does not contain a reference to ERISA plans. The Act states that health insurance carriers, HMOs, and other managed care entities have a duty to exercise ordinary care when making health care treatment decisions. TEX. CIV. PRAC. & REM. CODE ANN. § 88.002 (West 1998). None of these enumerated entities constitute ERISA plans since, by definition, they are not "established or maintained by an employer or by an employee organization ... for the purpose of providing" health care benefits for employees. 29 U.S.C.A. § 1002(1) (West Supp.1998); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 88.001 (West 1998).

In this case, the Court finds that, as in *Travelers,* the existence of an ERISA plan is not essential to the operation of the Act. Furthermore, the Act does not work "immediately and exclusively upon ERISA plans." *Dillingham,* 514 U.S. at ——, 117 S.Ct. at 838. Consequently, the Court concludes that the Act "cannot be said to make a 'reference to' ERISA plans in any manner." *Travelers,* 514 U.S. at 656, 115 S.Ct. at 1677.

Plaintiffs also suggest that the Act explicitly refers to ERISA plans by its use of the term "health care plan" and "managed care entity." (Plaintiff's Motion, Instrument No. 20 at 8). The Act defines "health care plan" as "any plan whereby a person undertakes to provide, arrange for, pay for, or reimburse any part of the cost of any health care services." TEX. CIV. PRAC. & REM. CODE ANN. § 88.001(3) (West 1998). The Act then states that a "managed care entity for a *health care plan* " must exercise ordinary care when making medical decisions. *Id.* § 88.002(a) (emphasis added). The phrase "health care plan" cannot be isolated from the term "managed care entity" simply to create a reference to an ERISA plan. In this context, "health care plan" cannot constitute an ERISA plan because a "managed care entity ... does not include an employer purchasing coverage or acting on behalf of its employees[.]" *Id.* § 88.001(8).

### 2. "Connection With"

"A law that does not refer to ERISA plans may yet be pre-empted if it has a 'connection with' ERISA plans." *Dillingham,* 519 U.S. at ——, 117 S.Ct. at 838. "To determine whether a state law has the forbidden connection, [the court looks] ... both to 'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive,' as well as to the nature of the effect of the state law on ERISA plans." *Id.* (quoting *Travelers,* 514 U.S. at 656, 115 S.Ct. at 1677); *see De Buono,* 520 U.S. at ——, 117 S.Ct. at 1750 (noting the Court's rejection of a strictly literal reading of Section 514(a) and emphasis on the objectives of the ERISA statute).

Here, Plaintiffs contend that the Act has a "connection with" ERISA plans in several ways. Plaintiffs claim that the Act improperly imposes state law liability on ERISA entities, impermissibly mandates the structure of plan benefits and their administration, unlawfully binds plan administrators to particular choices, and wrongfully creates an alternate enforcement mechanism. (Plaintiffs' Motion, Instrument No. 20 at 9–18).

#### i. Imposition of State Law Liability

According to Plaintiffs, the "Fifth Circuit has twice held that attempts to impose state law liability on managed care entities in 'connection with' their 'health care treatment decisions' fall within the scope of the preemption clause." (Plaintiffs' Response, Instrument No. 20 at 10). In particular, Plaintiffs rely on the Fifth Circuit's decisions in *Corcoran v. United HealthCare, Inc.,* 965 F.2d 1321 (5th Cir.1992), and *Rodriguez v. Pacificare of Tex., Inc.,* 980 F.2d 1014 (5th Cir.1993) for this argument.

In *Corcoran,* 965 F.2d at 1331, the Fifth Circuit held that a Louisiana tort action for the wrongful death of an unborn child was preempted by ERISA. In that case, United HealthCare ("United"), the provider of utilization review services [5] to an employee ben-

---

**5.** "Utilization review" is a form of cost-containment service that "refers to 'external evaluations that are based on established clinical criteria and are conducted by third-party payors, purchasers, or health care organizers to evaluate the appro-

priateness of an episode, or series of episodes, of medical care.'" *Corcoran,* 965 F.2d at 1323 (quoting Blum, *An Analysis of Legal Liability in Health Care Utilization Review and Case Management,* 26 HOUS. L. REV. 191, 192–93 (1989)).

efit plan, determined that Mrs. Corcoran's hospitalization during the final months of her pregnancy was not necessary despite her doctors' repeated recommendations for complete bed rest. *Id.* at 1322–24. The contract between United and Mrs. Corcoran's employer provided that United would "contact the Participant's physician and based upon the medical evidence and normative data determine whether the Participant should be eligible to receive full plan benefits for the recommended hospitalization and the duration of benefits." *Id.* at 1331 (quotation omitted). Contrary to her doctor's requests, United only authorized ten hours per day of home nursing care for Mrs. Corcoran. *Id.* at 1324.

While the nurse was off-duty, the fetus went into distress and died. *Id.* Subsequently, the Corcorans brought suit against United for wrongful death, alleging "that their unborn child died as a result of various acts of negligence committed by" the mother's health plan and United. *Id.* at 1324.

United argued that the Corcorans' claims were preempted by ERISA because its "decision [was] made in its capacity as a plan fiduciary [and was] about what benefits were authorized under the [p]lan." *Id.* at 1329. According to United, the company simply applied previously established eligibility criteria in order to determine whether Mrs. Corcoran was qualified for the benefits provided by the plan. *Id.* Thus, United maintained that, under prevailing ERISA preemption law, the Corcorans could not "sue in tort to redress injuries flowing from decisions about what benefits are to be paid under a plan." *Id.* at 1330.

The Corcorans, on the other hand, contended that their cause of action sought "to recover benefits solely for United's erroneous medical decision that Mrs. Corcoran did not require hospitalization during the last month of her pregnancy." *Id.* at 1330. Therefore, the Corcorans continued, United's exercise of medical judgment fell "outside the purview of ERISA preemption." *Id.*

Unable to agree with either characterization, the Fifth Circuit concluded that United made "medical decisions ... in the context of making a determination about the availability of benefits under the plan." *Id.* at 1331. The Court reasoned that "United decide[d] 'what the medical plan ... [would] pay for.' When United's actions [we]re viewed from this perspective, it ... [became] apparent that the Corcorans [we]re attempting to recover for a tort allegedly committed in the course of handling a benefit determination." *Id.* at 1332 (quoting the Quality Care Program ("QCP") booklet which contains a description of the QCP, a cost-containment service plan, and the services provided by United). Since United made the erroneous medical decision as a "part and parcel of its mandate to decide what benefits [we]re available under the ... plan[,]" the Court concluded that ERISA's preemption of "state-law claims alleging improper handling of benefit claims [wa]s broad enough to cover the cause of action asserted here." *Id.* "Although imposing liability on United ... [may] have the salutary effect of deterring poor quality medical decisions, ... [the Court found there was] a significant risk that state liability rules would be applied differently to the conduct of utilization review companies in different states." *Id.* at 1333.

Despite its finding of preemption, the Court acknowledged "the fact that ... [its] interpretation of the preemption clause ... [left] a gap in remedies within a statute intended to protect participants in employee benefit plans" and suggested a reevaluation of ERISA. *Id.* at 1333, 1338–39. Indeed, the Fifth Circuit recognized that:

> [t]he result ERISA compels us to reach means that the Corcorans have no remedy, state or federal, for what may have been a serious mistake. This is troubling for several reasons. First, *it eliminates an important check on the thousands of medical decisions routinely made in the burgeoning utilization review system.* With liability rules generally inapplicable, there is theoretically less deterrence of substandard medical decision making. Moreover, if the cost of compliance with a standard of care ... need not be factored into utilization review companies' cost of doing business, bad medical judgments will end up being cost-free to the plans that rely on these companies to contain medical costs. ERISA plans, in turn, will have one less

incentive to seek companies that can deliver both high quality services and reasonable prices.

Second, in any plan benefit determination, there is always some tension between the interest of the beneficiary in obtaining quality medical care and the interest of the plan in preserving the pool of funds available to compensate all beneficiaries....

Finally, cost containment features such as the one at issue in this case did not exist when Congress passed ERISA. While we are confident that the result we have reached is faithful to Congress's intent neither to allow state-law causes of actions that related to employee benefit plans nor to provide beneficiaries in the Corcoran's position with a remedy under ERISA, the world of employee benefit plans has hardly remained static since 1974. *Fundamental changes such as the widespread institution of utilization review would seem to warrant a reevaluation of ERISA so that it can continue to serve its noble purpose of safeguarding the interests of employees. Our system, of course, allocates this task to Congress, not the courts, and we acknowledge our role today by interpreting ERISA in a manner consistent with the expressed intentions of its creators.*

*Id.* at 1338 (emphasis added).[6] Since *Corcoran*, the Supreme Court has reevaluated the "potentially infinite reach of 'relations' and 'connections'" under ERISA preemption and has rendered three decisions, namely *Travelers, Dillingham, and De Buono v. NYSA–ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997), that "reveal the proper way to analyze[ ] ERISA preemption." *American Drug Stores, Inc. v. Harvard Pilgrim Health Care, Inc.*, 973 F.Supp. 60,64–65 (D.Mass.1997) (quoting *Travelers*, 514 U.S. at 656, 115 S.Ct. at 1677).[7]

Without the benefit of these recent opinions, the Court in *Corcoran* stated that "the fact that states traditionally have regulated in a particular area is no impediment to ERISA pre-emption." 965 F.2d at 1334. As such, the Court did not begin, as the recent Supreme Court cases did, with the presumption against preemption where the statute at issue addresses a historic police power of the states-namely, a matter of health and safety. *See Dillingham*, 519 U.S. at ——, 117 S.Ct. at 838; *De Buono*, 520 U.S. at ——, 117

---

**6.** The Fifth Circuit also requested further clarification from the Supreme Court and further legislative action from Congress in *Texas Pharmacy*, 105 F.3d at 1039–40. In *Texas Pharmacy*, the Court "conclude[d] that the result in that case [wa]s compelled by the unmistakable breadth of ERISA preemption recognized by the Supreme Court[.]" *Id.* at 1040. The Court, however, emphasized that "[a] different result ... [would] require further guidance from the Supreme Court or further action from Congress." *Id.*

**7.** Indeed, in light of the fundamental changes that have taken place in the health care delivery system, it may be that the Supreme Court has gone as far as it can go in addressing this area and it should be for Congress to further define what rights a patient has when he or she has been negatively affected by an HMO's decision to deny medical care. Congress has begun to examine the "cost containment" objectives of health plans, referenced in *Corcoran*, to determine whether their original intent to disallow state causes of action related to the denial of benefits is still reasonable. See Larry Lipman & Rebecca Carr, *Rival Bills Aim to Heal HMO Issues*, ATLANTA J. & ATLANTA CONST., July 17, 1998, at A1. "A House Republican task force outlined a bill that seeks to give patients ... an appeals process for managed care decisions. ...." *Id.*

However, in a recent statement regarding H.R. 4250, the Patient Protection Act, Congressman Pete Sessions indicated the legislature's desire to have the judiciary define the scope of ERISA preemption. 144 CONG. REC. E1471–04 (daily ed. July 30, 1998) (speech of Representative Pete Sessions). Regrettably, Rep. Sessions sought to "ensure that the Patient Protection Act neither broaden[ed] nor change[d] the current scope of ERISA preemption as it [wa]s being developed in the courts." *Id.* at E1472. This statement clearly exemplifies the legislature's misunderstanding as to the role of the judiciary. The courts can neither narrow nor broaden the scope of ERISA preemption in a vacuum. Rather, the courts can only attempt to interpret the scope of the ERISA preemption clause, as enacted by Congress some 24 years ago, in light of the congressional intent. Defining the scope of ERISA preemption is a responsibility delegated to the legislative branch of government. Interpreting the legislative intent concerning the scope of ERISA preemption can only be accomplished by the courts after the legislature has done its job. If Congress wants the American citizens to have access to adequate health care, then Congress must accept its responsibility to define the scope of ERISA preemption and to enact legislation that will ensure every patient has access to that care.

S.Ct. at 1751–52; *Travelers,* 514 U.S. at 653–55, 115 S.Ct. at 1676–77. Instead, the Court in *Corcoran* reasoned that "Congress perhaps *could not have predicted* the interjection into the ERISA 'system' of the medical utilization review process[,]" and therefore, concluded that "Congress enacted a preemption clause so broad and a statute so comprehensive that it would be incompatible with the language, structure, and purpose of the statute to allow tort suits against entities so integrally connected with a plan." *Corcoran,* 965 F.2d at 1334 (emphasis added). Although the fact that "the States traditionally regulated ... [certain] areas would not immunize their efforts[,]" since *Corcoran,* it is clear that there must be an "indication in ERISA ... [or] its legislative history of any *intent on the part of Congress* to preempt" a traditionally state-regulated substantive law. *Dillingham,* 519 U.S. at ——, 117 S.Ct. at 840–41 (emphasis added).

Furthermore, in *Corcoran,* the Court noted that:

> [t]he cost of complying with varying substantive standards would increase the cost of providing utilization review services, thereby increasing the cost to health benefit plans of including cost containment features such as the Quality Care Program (or causing them to eliminate this sort of cost containment program altogether) and ultimately decreasing the pool of plan funds available to reimburse participants.

965 F.2d at 1333. However, the Supreme Court in *Travelers* emphasized that an "indirect economic influence ... does not bind a plan administrator to any particular choice and thus function as a regulation of an ERISA plan itself." 514 U.S. at 659, 115 S.Ct. at 1679. Moreover,

> if ERISA were concerned with any state action—such as quality of care standards or hospital workplace regulations—that in-

creased the cost of providing certain benefits, and thereby, potentially affected the choices made by ERISA plans, [then] we could scarcely see the end of ERISA's preemptive reach, and the words 'relate to' would limit nothing.

*Dillingham,* 519 U.S. at ——, 117 S.Ct. at 840 (citing *Travelers,* 514 U.S. at 663–64, 115 S.Ct. at 1681).

In light of the Supreme Court's recent mandate regarding ERISA preemption analysis, perhaps the Fifth Circuit would reach a different decision in *Corcoran* today. Even so, this Court finds the facts in *Corcoran* to be distinguishable from the conduct covered by the Act.

The plaintiffs in *Corcoran* filed suit against their HMO regarding a *medical decision made in relation to the denial of certain plan benefits.* In this case, a suit brought under the Act would relate to the *quality of benefits* received from a managed care entity when benefits are actually provided, not denied. The Act imposes a duty of ordinary care upon certain entities when making health care treatment decisions and holds those entities liable for damages proximately caused by a failure to exercise that duty. TEX. CIV. PRAC. & REM. CODE ANN. § 88.002(a) (West 1998). Furthermore, the Act clearly states that a "health care treatment decision" is "a determination made when medical services are *actually provided* by the health care plan and a decision which affects the *quality* of the diagnosis, care, or treatment provided to the plan's insureds or enrollees." *Id.* § 88.001(5) (emphasis added). Thus, *Corcoran* is factually distinguishable from the instant case.[8]

The facts in *Rodriguez v. Pacificare of Tex., Inc.,* the other case cited by Plaintiffs for their argument that the Act wrongfully

---

8. The Court in *Corcoran* recognized a similar distinction. The Court discussed *Independence HMO, Inc. v. Smith,* 733 F.Supp. 983 (E.D.Pa. 1990), a case in which the district court held that a malpractice action brought against an HMO was not preempted by ERISA, and acknowledged that the *Smith* case initially appeared to support the Corcorans' position since "the plaintiff was attempting to hold an ERISA entity liable for medical decisions." *Corcoran,* 965 F.2d at 1333

n. 16. However, the Court distinguished the facts in *Smith* from the Corcorans' situation because "the medical decisions at issue ... [in *Smith* did] not appear to have been made in connection with a cost containment feature of the plan or any other aspect of the plan which implicated the management of plan assets, but were instead made by a doctor in the course of treatment." *Id.*

imposes state law liability on managed care entities, may be distinguished for the same reason. In *Rodriguez,* David Rodriguez ("Rodriguez") brought a negligence action against his HMO and his primary care physician. 980 F.2d at 1016. Rodriguez attempted to seek medical attention for himself and his children after they were involved in an automobile accident. *Id.* Rodriguez believed that he and his children needed to see an orthopedic surgeon, but he was unable to obtain the requisite referral letter from their primary care physician or his HMO. *Id.* Without obtaining the needed letter, Rodriguez and his family went to see an orthopedic surgeon who placed Rodriguez on a therapy program. *Id.* Rodriguez's HMO refused to cover the expenses because Rodriguez had not first obtained approval for such expenses as required by his plan. *Id.* Rodriguez thereafter filed suit against his HMO and primary care physician "for failing to 'provide prompt and adequate medical care and coverage.'" *Id.* (quoting Rodriguez's complaint filed in Texas state court).

The Fifth Circuit determined that Rodriguez's state law claims were sufficiently related to the "employee benefit plan" because his "claims, at bottom, result[ed] from dissatisfaction over ... [his HMO's] handling of his medical claim." *Id.* at 1017. Unlike Rodriguez's claims against his HMO and primary care physician, a suit brought under the Act may challenge the quality of benefits actually received without challenging a denial of benefits or the handling of a

medical claim. A suit addressing the quality of care actually received is more akin to the claims asserted by plaintiffs in *Dukes v. U.S. Healthcare, Inc.,* 57 F.3d 350 (3d Cir.1995).[9]

In *Dukes,* the Third Circuit examined two separate claims. The first claim involved the death of Darryl Dukes ("Dukes"). Dukes had several ailments which prompted him to visit his primary care physician who identified a problem with his ear. *Dukes,* 57 F.3d at 352. Later, another doctor performed surgery on Dukes's ear and ordered blood tests to be performed. *Id.* For some unknown reason, when Dukes presented the prescription to the laboratory, the hospital refused to perform the blood tests. *Id.* On the next day, Dukes went to see a third doctor who also ordered blood tests. *Id.* The hospital performed the tests. *Id.* However, by that time, Dukes's condition had worsened and he subsequently died. At the time of his death, Dukes's blood sugar level was extremely high—a condition that allegedly could have been detected through a timely blood test. *Id.*

The other claim, examined in *Dukes,* concerned Ronald and Linda Visconti and their stillborn child. *Id.* at 353. The Viscontis maintained that Linda's obstetrician negligently ignored symptoms that Linda exhibited during the third trimester of her pregnancy that were typical of preeclampsia. *Id.*

"[T]he plaintiffs in these two cases filed suit in state court against health maintenance organizations ("HMOs") organized by U.S.

---

**9.** As an additional argument, Defendants suggest that "AEtna is barred by res judicata from asserting ERISA preemption as a defense to the quality of care claims embodied in Senate Bill 386." (Defendants' Response, Instrument No. 46 at 19). According to Defendants, the *Dukes* case is "res judicata as to AEtna because AEtna is the successor in interest to the defendant in *Dukes,* U.S. Healthcare." (*Id.*). "As the successor in interest to U.S. Healthcare after *Dukes* was decided, [Defendants continue] AEtna was in essence the HMO that lost in *Dukes,* wherein the court clearly limited and expressly distinguished the holding of *Corcoran* from cases in which the claims are based on the quality of care provided by the HMOs." (*Id.*).

The Fifth Circuit's "test for res judicata requires that: (1) The parties be identical in both suits, (2) A court of competent jurisdiction rendered the prior judgment, (3) There was a final

judgment on the merits in the previous decision, and (4) The plaintiff raises the same cause of action or claim in both suits." *In re Howe,* 913 F.2d 1138, 1143–44 (5th Cir.1990). In this case, Defendants' res judicata argument clearly fails to meet the fourth requirement. Plaintiffs seek a declaration that the Act is preempted by Section 514(a) of ERISA whereas, in *Dukes,* 57 F.3d at 351, U.S. Healthcare, Inc. sought a determination that removal of the plaintiffs' claims to federal court was proper under the complete preemption doctrine. Furthermore, in *Dukes,* the Third Circuit did not address whether the plaintiffs' state law claims were preempted under Section 514(a)—the exact issue in this case. *Id.* at 361. Rather, the Court left this issue open for resolution by the state courts on remand. *Id.* Consequently, the Court finds that Aetna is not by barred by res judicata from arguing that the Act is preempted by ERISA.

Healthcare, Inc., claiming damages, under various theories, for injuries arising from the medical malpractice of the HMO-affiliated hospitals and medical personnel." *Id.* at 351. The defendant HMOs removed both cases to federal court based on the "complete preemption doctrine." [10] *Id.* at 351. The Court held that since plaintiffs' claims fell outside the scope of the ERISA provision granting the right to recover benefits and enforce rights due under terms of the plan or to clarify rights to future benefits then the complete preemption doctrine did not permit removal. *Id.* In particular, the Court held that "*[q]uality control of benefits,* such as health care benefits provided here, is a field traditionally occupied by state regulation." *Id.* at 357 (emphasis added) (citing *Travelers,* 514 U.S. at 657–59, 115 S.Ct. at 1678–79). The Court then "interpret[ed] the silence of Congress as reflecting an intent that it remain as such." *Id.*

This Court finds the discussion in *Dukes* to be applicable here.[11] The Court, in *Dukes,* made a distinction between a claim for the withholding of benefits and a claim about the quality of benefits received. The Court reasoned that "[i]nstead of claiming that the welfare plans in any way withheld some quantum of plan benefits due, the plaintiffs in both cases complain[ed] about the *low quality of the medical treatment* that they *actually received* ...." *Id.* at 357 (emphasis added). In particular, "Dukes d[id] not allege

... that the Germantown Hospital refused to perform blood studies on Darryl because the ERISA plan refused to pay for those studies. Similarly, the Viscontis d[id] not contend that Serena's death was due to their welfare plan's refusal to pay for or otherwise provide for medical services." *Id.* at 356–57. In this case, a suit may be brought under the Act that simply challenges the quality of the benefits received, not a benefit determination.

Also in *Dukes,* the Court distinguished the *Corcoran* case based on the dual roles that may be assumed by an HMO. *Dukes,* 57 F.3d at 360–61. The Court emphasized that in *Corcoran,* United "only performed an administrative function inherent in the 'utilization review'" whereas the defendant HMOs in *Dukes* played two roles—the utilization review role and the role as an arranger for the actual medical treatment for plan participants. *Id.* at 361. "[U]nlike *Corcoran,* [in *Dukes* ] there ... [was] no allegation ... that the HMOs denied anyone any benefits that they were due under the plan. Instead, the plaintiffs [in *Dukes* were] ... attempting to hold the HMOs liable for their role as the arrangers of their decedents' medical treatment." *Id.* Likewise, a plaintiff bringing suit under the Act may seek to hold a HMO liable in its position as the arranger of poor quality medical treatment, thereby, avoiding any allegation that the HMO wrongfully denied benefits under the plan and therefore, any connection with ERISA.[12]

---

**10.** The "complete preemption" exception provides that "Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63–64, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987). "The Supreme Court has determined that Congress intended the complete-preemption doctrine to apply to state causes of action which fit within the scope of ERISA's civil-enforcement provisions." *Dukes,* 57 F.3d at 354 (quoting *Metropolitan Life,* 481 U.S. at 64–66, 107 S.Ct. at 1547–48).

**11.** Plaintiffs claim that this Court cannot rely on the discussion in *Dukes* because it is a removal case. (Plaintiffs' Motion, Instrument No. 20 at 31). The Court recognizes that a determination that a claim is not completely preempted under Section 502(a) of ERISA does not necessarily mean that that claim is not preempted under Section 514. *See Dukes,* 57 F.3d at 352 (holding that plaintiffs' claims are not completely

preempted under Section 502, but remanding the case to the state court for a determination of whether plaintiffs' claims are preempted under Section 514(a)); *Rice v. Panchal,* 65 F.3d 637, 646 n. 10 (7th Cir.1995). However, the Court finds the Third Circuit's discussion of state regulation of "quality of care" to be quite relevant to the instant case.

Notably, despite their supposed opposition to removal cases, Plaintiffs also request this Court to rely heavily on two other removal cases, *Corcoran* and *Rodriguez.*

**12.** The Third Circuit cautions that "the distinction between quantity of benefits due under a welfare plan and the quality of those benefits will not always be clear ... where the benefit contracted for is health care services rather than money to pay for such services." *Dukes,* 57 F.3d at 358. In some cases, "it may be appropriate to conclude that the plan participant or beneficiary has been denied benefits under the plan." *Id.*

Thus, the distinction can be summarized as follows:

> Claims challenging the quality of a benefit, as in *Dukes*, are not preempted by ERISA. *See Pacificare of Oklahoma, Inc. v. Burrage*, 59 F.3d 151, 154 (10th Cir.1995) (medical malpractice claim not preempted by ERISA when issue of doctor's negligence required assessment of providing admittedly covered treatment or giving professional advice). Claims based upon a failure to treat where the failure was the result of a determination that the requested treatment wasn't covered by the plan, however, are preempted by ERISA. *Corcoran v. United HealthCare, Inc.*, 965 F.2d 1321, 1331 (5th Cir.), *cert. denied*, 506 U.S. 1033, 113 S.Ct. 812, 121 L.Ed.2d 684 (1992) (medical determinations made by an HMO preempted by ERISA because made in context of benefits determination under the plan).

*Schmid v. Kaiser Found. Health Plan of Northwest*, 963 F.Supp. 942, 944 (D.Or.1997).

In this case, the Act addresses the quality of benefits actually provided. ERISA "simply says nothing about the quality of benefits received." *Dukes*, 57 F.3d at 357. "A reading of ... [Section] 514(a) resulting in the preemption of traditionally state-regulated substantive law in ... [an] area[ ] where ERISA has nothing to say would be 'unsettling.'" *Dillingham*, 519 U.S. at ——, 117 S.Ct. at 840 (quoting *Travelers*, 514 U.S. at 664–65, 115 S.Ct. at 1681).

Furthermore, "the Supreme Court has cautioned that '[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan.'" *CIGNA*, 82 F.3d at 647 (quoting *Shaw*, 463

U.S. at 100 n. 21, 103 S.Ct. 2890, 2901 n. 21, 77 L.Ed.2d 490). For example, "'run-of-the-mill state-law claims such as unpaid rent, failure to pay creditors, or even torts committed by an ERISA plan' are not pre-empted." *Corcoran*, 965 F.2d at 1329 (quoting *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 833, 108 S.Ct. 2182, 2187, 100 L.Ed.2d 836 (discussing these types of claims in dicta)). In addition, "ERISA does not preempt state laws that have 'only an indirect economic effect on the relative costs of various health insurance packages' available to ERISA-qualified plans" such as quality standards. *CIGNA*, 82 F.3d at 647 (quoting *Travelers*, 514 U.S. at 659–60, 115 S.Ct. at 1680); *see Dillingham*, 519 U.S. at ——, 117 S.Ct. at 840 (noting that if ERISA were concerned with any state action, such as medical care quality standards, that increased costs of providing certain benefits then courts could scarcely see the end of ERISA's preemptive reach); *Pacificare*, 59 F.3d at 154 ("As long as a state law does not affect the structure, the administration, or type of benefits provided by an ERISA plan, the mere fact that the [law] has some economic impact on the plan does not require that the [law] be invalidated."). As such, the Court finds that *"[q]uality control of benefits*, such as the health care benefits provided [by HMOs and other managed care entities], is a field traditionally occupied by state regulation and ... interprets the silence of Congress as reflecting an intent that it remain such." *Dukes*, 57 F.3d at 357 (emphasis added).

Accordingly, the Court concludes that the Act does not constitute an improper imposition of state law liability on the enumerated entities.[13]

---

Such a determination should be made on a case-by-case basis. *See Schmid v. Kaiser Found. Health Plan of Northwest*, 963 F.Supp. 942, 945 n. 1 (D.Or.1997).

**13.** Plaintiffs also argue that Section 88.002(b) of the Texas Civil Practice and Remedies Code, as added by the Act, improperly imposes vicarious liability on the enumerated entities for the negligent health care treatment decisions of their employees, agents, ostensible agents, or other representatives. (Plaintiff's Motion, Instrument No. 20 at 14). Plaintiffs claim that the Seventh Circuit's decision in *Jass v. Prudential Health Care*

*Plan, Inc.*, 88 F.3d 1482 (7th Cir.1996), calls for this conclusion. In *Jass*, the HMO's agent determined that physical therapy to rehabilitate the plaintiff's knee after her surgery was not necessary. *Id.* at 1485. After suffering permanent damage to her knee, the plaintiff filed a negligence claim against the agent and a vicarious liability claim against the HMO and surgeon. *Id.* The Court dismissed the plaintiff's claim against her HMO for vicarious liability based on the agent's conduct because her cause of action was held to be a Section 502(a) denial of benefits claim, not a quality of care suit. *Id.* at 1491.

### ii. Mandating the Structure and Administration of Plan Benefits

Next, the Court will examine Plaintiffs' argument that the Act has a connection with ERISA plans because it improperly mandates the structure of plan benefits and their administration in violation of clear Supreme Court authority. In *Travelers*, the Court noted that, given the objectives of ERISA and its preemption clause, Congress intended for ERISA to preempt "state laws that mandate[ ] employee benefit structures or their administration." 514 U.S. at 658, 115 S.Ct. at 1678. For example, in *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983), the Court held that a New York statute "which prohibit[ed] employers from structuring their employee benefit plans in a particular manner that discriminate[d] on the basis of pregnancy ... [and another statute] which require[d] employers to pay employees specific benefits ... clearly 'relate[d] to' benefit plans." ERISA preempted these New York statutes because their "mandates affecting coverage could have been honored only by varying the subjects of a plan's benefits whenever New York law might have applied, or by requiring every plan to provide all beneficiaries with a benefit demanded by New York law if New York law could have been said to require it for any one beneficiary." *Travelers*, 514 U.S. at 657, 115 S.Ct. at 1678. Therefore, "absent preemption, benefit plans would have been subjected to conflicting directives from one state to the next." *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1468 (4th Cir.1996) (citing *Shaw*, 463 U.S. at 99, 103 S.Ct. at 2901).

Plaintiffs claim that the Act "imposes a 'negligence' standard of review on HMOs and PPOs ... in contravention of the federally mandated abuse of discretion standard of review of a factual benefit determination under ERISA[,]" and "purports to re-define the standard for 'appropriate and medically necessary' as it pertains to ERISA plans." (Plaintiffs' Motion, Instrument No. 20 at 15).

With respect to Plaintiffs' first contention, the Court reiterates its conclusion that a suit may only be brought under the Act that challenges the quality of care received, not a benefit determination. Such a claim would not implicate the abuse of discretion standard required under ERISA for factual benefit determinations. *See Pierre v. Connecticut Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir.1991) (holding that "for factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard"). Whether a claim brought under the Act seeks a review of a plan administrator's factual benefit determination rather than a review of a medical decision should be examined by the Court on a case-by-case basis. At that time, the Court could determine whether or not the particular claim conflicts with the standard of review provided under ERISA.

Plaintiffs also claim that the Act wrongfully purports to redefine the standard for "appropriate and medically necessary" as it pertains to ERISA plans. (Plaintiffs' Motion, Instrument No. 20 at 15). Section 88.001(1) of the Texas Civil Practice and Remedies Code, which was added by the Act, defines "appropriate and medically necessary" as "the standard for health care services as determined by physicians and health care providers in accordance with the prevailing practices and standards of the medical profession and community." Tex. Civ. Prac. & Rem. Code Ann. § 88.001(1) (West 1998). Plaintiffs contend that "[t]his imposed definition of medical necessity is different from that contained in many ERISA plans." (Plaintiffs' Motion, Instrument No. 20 at 15).

---

Thus, the *Jass* case is inapposite since this Court has already determined that a suit may be brought under the Act that challenges the quality of a benefit received.

Furthermore, whether a suit brought under the Act against an HMO for vicarious liability based on the actions of a doctor would be preempted should be determined on a case-by-case basis and would be dependent upon the provisions of the plan and the claims asserted by the plaintiffs. The Court may or may not be required to examine the plan to determine the nature of the relationship between the parties. *See e.g., Jass*, 88 F.3d at 1493 (dismissing vicarious liability claim against HMO based on doctor's conduct because agency relationship was solely a result of HMO's health care plan and because claim required examination of the plan).

Since Plaintiffs' health care plans purportedly confer authority upon the plan administrator to make coverage determinations in accordance with the terms of the plan, Plaintiffs argue that the Act's definition of "appropriate and medically necessary" changes "the terms of employee benefit plans and restrict[s] the ability of plans to deny claims based upon medical necessity or other terms defined in the plan." (*Id.* at 16).

With respect to the Act's definition of when a health care benefit is "appropriate and medically necessary," the Court must examine this term in conjunction with the procedure provided by the Act for the review of claims relating to an adverse benefit determination by an independent review organization ("IRO"). Section 88.003 of the Texas Civil Practice and Remedies Code, as added by the Act, provides the following:

(a) A person may not maintain a cause of action under this chapter against a health insurance carrier, health maintenance organization, or other managed care entity that is required to comply with the utilization review requirements of Article 21.58A, Insurance Code, or the Texas Health Maintenance Organization Act (Chapter 20A Vernon's Insurance Code), unless the affected insured or enrollee or the insured's or enrollee's representative:

(1) has exhausted the appeals and review applicable under the utilization review requirements; or

(2) before instituting the action:

(A) gives written notice of the claim as provided by Subsection (b); and

(B) agrees to submit the claim to a review by an *independent review organization under Article 21.58A, Insurance Code,* as required by Subsection (c).

(b) the notice required by Subsection (a)(2)(A) must be delivered or mailed to the health insurance carrier, health maintenance organization, or other managed care entity against whom the action is made not later than the 30th day before the date the claim is filed.

(c) The insured or enrollee or the insured's or enrollee's *representative must* *submit the claim to a review by an independent review organization if the health insurance carrier, health maintenance organization, or managed care entity against whom the claim is made requests the review not later than the 14th day after the date notice under Subsection (a)(2)(A) is received* by the health insurance carrier, health maintenance organization, or other managed care entity. If the health insurance carrier, health maintenance organization, or other managed care entity does not request the review within the period specified by this subsection, the insured or enrollee or the insured's or enrollee's representative is not required to submit the claim to independent review before maintaining the action.

(d) Subject to Subsection (e), if the enrollee has not complied with Subsection (a), an action under this section shall not be dismissed by the court, *but the court may, in its discretion, order the parties to submit to an independent review* or mediation or other nonbinding alternative dispute resolution and may abate the action for a period of not to exceed 30 days for such purposes. Such orders of the court shall be the sole remedy available to a party complaining of an enrollee's failure to comply with Subsection (a).

(e) The enrollee is not required to comply with Subsection (c) and no abatement or other order pursuant to Subsection (d) for failure to comply shall be imposed if the enrollee has filed a pleading alleging in substance that:

(1) harm to the enrollee has already occurred because of the conduct of the health insurance carrier, health maintenance organization, or managed care entity or because of an act or omission of an employee, agent, ostensible agent, or representative of such carrier, organization, or entity for whose conduct is liable under Section 88.002(b); and

(2) the review would not be beneficial to the enrollee, unless the court, upon motion by a defendant carrier, organization, or entity finds after that such pleading was not made in good faith, in which

case the court may enter an order pursuant to Subsection (d).

(f) If the insured or enrollee or the insured's or enrollee's representative seeks to exhaust the appeals and review or provides notice, as required by Subsection (a), before the statute of limitations applicable to a claim against a managed care entity has expired, the limitations period is tolled until the later of:

(1) the 30th day after the date the insured or enrollee or the insured's or enrollee's representative has exhausted the process for appeals and review applicable under the utilization review requirements; or

(2) the 40th day after the date the insured or enrollee or the insured's or enrollee's representative gives notice under Subsection (a)(2)(A).

(g) This section does not prohibit an insured or enrollee from pursuing other appropriate remedies, including injunctive relief, a declaratory judgment, or relief available under law, if the requirement of exhausting the process for appeal and review places the insured's or enrollee's health in serious jeopardy.

Tex. Civ. Prac. & Rem. Code Ann. § 88.003 (West 1998) (emphasis added).

In addition, the Act amended and added several provisions to the Texas Insurance Code that address specific responsibilities of an HMO and further explain and define the procedure for independent review of an adverse benefit determination by an IRO. *See* Tex. Ins. Code Ann. arts. 20A.09, 20A.12, 20A.12A, 21.58A, and 21.58C (West 1998). Article 20A.09, which was amended by the Act, now requires an HMO to issue evidence of coverage to an enrollee that describes "the enrollee's right to appeal denials of an adverse determination ... to an independent review organization." Tex. Ins. Code Ann. art. 20A.09(e)(4) (West 1998).

Under the amendments to Article 20A.12 of the Texas Insurance Code, every HMO must establish a complaint system that provides for the "resolution of oral and written complaints initiated by enrollees concerning health care services." *Id.* art. 20A.12(a). The complaint system mandated by Article

20A.12 has several requirements that reference the IRO procedure. Specifically, Article 20A.12A, which was also added by the Act, states that the complaint system must include:

(1) notification to the enrollee of the enrollee's right to appeal an adverse determination to an independent review organization;

(2) notification to the enrollee of the procedures for appealing an adverse determination to an independent review organization; and

(3) notification to an enrollee who has a life-threatening condition of the enrollee's right to immediate review by an independent review organization and the procedures to obtain that review.

*Id.* arts. 20A.12A(a) and (b). Article 20A.12A then defines "adverse determination," "independent review organization," and "life-threatening condition." *Id.* art. 20A.12A(c).

The Act also amends Article 21.58A Section 6 of the Texas Insurance Code. If the appeal of an adverse determination is denied, Section 6 now requires the utilization review agent to submit a clear and concise statement to the appealing party informing him of his "right to seek review of the denial by an independent review organization under Section 6A ... and the procedures for obtaining that review." *Id.* art. 21.58A(6)(b)(5)(C). Furthermore, if the enrollee is faced with a life threatening condition then he "is entitled to an immediate appeal to an independent review organization as provided by Section 6A[.]" *Id.* art. 21.58A(6)(c).

Furthermore, the Act adds a new section 6A to Article 21.58A of the Texas Insurance Code which outlines the utilization review agent's responsibilities with respect to the independent review of adverse determinations. *Id.* art. 21.58A(6A). In particular, Section 6A of Article 21.58A provides that:

A utilization review agent shall:

(1) permit any party whose appeal of an adverse determination is denied by the utilization review agent to seek review of that determination by an independent review organization assigned to the appeal in

accordance with Article 21.58C of this code;

(2) provide to the appropriate independent review organization not later than the third business day after the date that the utilization review agent receives a request for review a copy of:

(A) any medical records of the enrollee that are relevant to the review;

(B) any documents used by the plan in making the determination to be reviewed by the organization;

(C) the written notification described in Section 6(b)(5) of this article;

(D) any documentation and written information submitted to the utilization review agent in support of the appeal; and

(E) a list of each physician or health care provider who has provided care to the enrollee and who may have medical records relevant to the appeal;

(3) comply with the independent review organization's determination with respect to the medical necessity or appropriateness of health care items and services for an enrollee; and

(4) pay for the independent review.

*Id.* art. 21.58A(6A). Notably, under Article 20A.12A, the provisions in Article 21.58A that relate to independent review, namely Section 6A, apply to an HMO as if the HMO were a utilization review agent. *Id.* art. 20A.12A(b). Moreover, given the addition of the IRO procedure by the Act, Section 8 of Article 21.58A now provides that "[c]onfidential information in the hands of a utilization review agent may be provided to an independent review organization" subject to the rules and standards already in effect under the Texas Insurance Code. *Id.* art. 21.58A(8)(f).

Lastly, the Act added Article 21.58C to the Texas Insurance Code. This section outlines the standards for independent review organizations, such as certification requirements. Id. art. 21.58C. For example, Article 21.58C explains the Commissioner of the Texas Insurance Board's responsibilities for the certification and designation of independent review organizations and how an entity may be certified as an independent review organization. *Id.*

Plaintiffs argue that an administrator's determination as to "whether a claim for benefits is covered under the medical necessity definition contained in the plan implicates an interpretation of a plan's term." (Plaintiffs' Motion, Instrument No. 20 at 16). Therefore, Plaintiffs continue, the Act which contains these procedures for an independent review of a benefit determination is preempted because it mandates the structure and administration of benefits.

In response, Defendants maintain that "the IRO is geared solely to corporate determinations of 'medical necessity,' the practice of medicine admittedly being a non-preempted traditional area of state regulation." (Defendants' Response, Instrument No. 46 at 11). Defendants also explain, and Plaintiffs do not dispute, that "[o]nly when AEtna, or another managed care entity, makes adverse determinations that benefits are not medically necessary [do] the IRO provisions [become applicable]." (*Id.* at 14). According to Defendants, "the only possible HMO action that could be called a 'benefit determination' which could ever be grounds for action under the IRO provisions of ... [the Act] are 'adverse determinations.' Adverse determinations are necessarily limited to 'medical necessity' decisions[.]" (*Id.* at 12).

In *Travelers*, the Supreme Court provided guidance as to the scope of plan administration that Congress intended to protect from state interference. 514 U.S. at 657–68, 115 S.Ct. at 1678. The Court discussed

earlier decisions which held various state statutes preempted for "mandat[ing] employee benefit structures or their administration." ... The Court [also] explained that ERISA preempted the statutes at issue in *Shaw* because they imposed "mandates affecting coverage" which directly affected the benefit structures which ERISA plans could offer.... The law at issue in *FMC Corp. v. Holliday*[, 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990)] interfered with benefit calculations; by prohibiting plans from obtaining subrogation, the law frustrated any attempt at providing uniform national benefits.... In *Alessi v. Raybestos–Manhattan, Inc.*, [451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d

402 (1981)] ... ERISA preempted a statute which prohibited plans from using a method of calculating benefits permitted by federal law.... In each of these cases, the [Supreme] *Court was concerned with administrative and structural matters central to the administration of ERISA plans themselves.*

*American Drug,* 973 F.Supp. at 68 (emphasis added) (quoting *Travelers,* 514 U.S. at 657–58, 115 S.Ct. at 1677–78). The Act's use of independent review process implicates the "limited range of administrative functions which are part of operating an employee benefit plan[,]" namely determining the eligibility of claimants. *American Drug,* 973 F.Supp. at 66; *see Fort Halifax,* 482 U.S. at 8–9, 107 S.Ct. 2211, 2216, 96 L.Ed.2d 1 (1987).

Furthermore, the Act's definition of "appropriate and medically necessary" along with the provisions under Section 88.003 for reviewing an adverse determination by an IRO and the further clarification of the IRO procedure and requirements in Articles 20A.09(4), 20A.12A, 21.58A(6), (6A), and (8)(f) and 21.58C [14] are akin to the situation addressed by the Fifth Circuit in *Corcoran.* In *Corcoran,* the Court recognized that United gave medical advice, but emphasized that such advice was made or given while administering the benefits under the plan. 965 F.2d at 1331. Consequently, since ERISA preempts state law causes of action alleging the improper handling of benefit claims, the Corcorans' state law claims were preempted by ERISA because part of "United's actions involve[d] benefit determinations." *Id.* at 1332. As in *Corcoran,* by participating in the separate review process provided for under the Act, an insured or enrollee is seeking a review of a benefit determination. Moreover, under Article 21.58A of the Texas Insurance Code, a utilization review agent must comply with the IRO's determination and must pay for the review. Tex. Ins. Code Ann. arts. 21.58A(6A)(3) and (4) (West 1998).

Allowing state based procedures for independent review of an adverse benefit determination, like the one at issue here, "would subject plans and plan sponsors to burdens not unlike those that Congress sought to foreclose through ... [Section] 514(a). Particularly disruptive is the potential for conflict in state law.... Such an outcome is fundamentally at odds with the goal of uniformity that Congress sought to implement." *Ingersoll–Rand,* 498 U.S. at 142, 111 S.Ct. at 484.

■ Consequently, as explained by the Supreme Court in *Travelers,* 514 U.S. at 657, 115 S.Ct. at 1677–78, the Court finds that the provisions for an independent review improperly mandate the administration of employee benefits and therefore, have a connection with ERISA plans. *See Coyne,* 98 F.3d at 1468 (indicating that state laws which mandate employee benefit structures or their administration have a connection with ERISA plans). "Congress intended ERISA to preempt state laws[,] [such as the IRO provisions in the Act,] that 'mandate[ ] employee benefit structures or their administration.'" *Id.* (quoting *Travelers,* 514 U.S. at 658, 115 S.Ct. at 1678). However, the Court finds that the relevant language in Section 88.003 of the Texas Civil Practice and Remedies Code, the relevant language added by the Act in Articles 20A.09(e)(4), 21.58A(6)(b)(5), and 21.58A(6)(c) of the Texas Insurance Code, and that Articles 20A.12A, 21.58A(6A), 21.58A(8)(f), and 21.58C of the Texas Insurance Code, all addressing the IRO procedure, can be severed from the Act without affecting the other provisions or conflicting with the legislative intent.

■ "Whether portions of a state statute found to contravene federal law are severable is a question of state law." *Texas Pharmacy,* 105 F.3d at 1039. The Texas Code Construction Act provides that:

> [i]n a statute that does not contain a provision for severability or nonseverability, if any provision of the statute or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the statute that can be given effect without the invalid

---

14. As mentioned, Article 20A.12 of the Texas Insurance Code requires HMOs to maintain both an oral and a written complaint system. Tex Ins. Code Ann. art. 20A.12 (West 1998). This article does not discuss the IRO procedure that is addressed by the other amendments.

provision or application, and to this end the provisions of the statute are severable. TEX. GOV'T CODE ANN. § 311.032(c) (West 1988); see also TEX. GOV'T CODE ANN. § 312.013(a) (West 1988) (providing the same standard). Thus, "[u]nder the Texas Code Construction Act, a Texas statute should be deemed severable if the invalidity of one provision does not affect the other provisions, unless it has an express provision for severability or nonseverability." Texas Pharmacy, 105 F.3d at 1039; see In re Johnson, 554 S.W.2d 775, 787 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.) (noting that where invalid sections on an act may be separated, the court "must do so and not permit the invalid part to destroy the whole law"). However, the court should "sustain the remainder only if the result is consistent with the original legislative intent." Black v. Dallas County Bail Bond Bd., 882 S.W.2d 434, 437 (Tex.Civ.App.—Dallas 1994, no writ); see Anderson v. Wood, 137 Tex. 201, 152 S.W.2d 1084, 1087 (1941) (concluding that the whole statute was void because the remainder, by reason of its generality, would have given the act a broader scope than was intended by the legislature).

In this case, the Act does not have an express provision for severability or nonseverability of the statute. Furthermore, an examination of the legislative history of the Act reveals the dual purpose that the legislature sought to achieve with the passage of the Act. Specifically, the legislature sought to address two distinct issues: quality of care and denial of care. With respect to quality of care, the Act establishes a standard of care for HMOs and other managed care entities and allows participants to sue an HMO or a managed care entity for negligent medical decisions. (Index of Legislative History–Testimony of Rep. Smithee, Instrument No. 17, Exh. A at AG01585 and Exh. B at AGO1607). With regard to denial of care, the Act creates an independent review process that reviews adverse benefit determinations by an HMO or a managed care entity. (Id.) In particular, as a prerequisite to filing a lawsuit under the Act, a participant would "be able to get an independent review [of his or her HMO's denial of coverage] by a doctor [in order] to try and get the care" that he or she needs. (Index of Legislative History–Testimony of Rep. Smithee, Instrument No. 17, Exh. B at AG01607). Thus, the Court finds that it was clearly the intent of the legislature to address both the quality of care issue and the denial of care issue under the Act.

The Court has already determined that the IRO provisions concern the review of an adverse benefit determination and are therefore, an improper mandate of benefit administration. As such, the IRO provisions and, in particular, the relevant language in Section 88.003 of the Texas Civil Practice and Remedies Code, the relevant language added by the Act in Articles 20A.09(e)(4), 21.58A(6)(b)(5), and 21.58A(6)(c) of the Texas Insurance Code, and Articles 20A.12A, 21.58A(6A), 21.58A(8)(f), and 21.58C of the Texas Insurance Code would have no effect on lawsuits that may be brought under the Act challenging the quality of a benefit that an individual has actually received. The Court can still give effect to the provisions of the Act that only address quality of care. In other words, even without these sections which address the IRO procedure, suits addressing the quality of a benefit may still be brought under the Act against an HMO or other managed care entity. This goal under the Act—quality of care—is separate and distinct from the independent review process which solely addresses adverse benefit determinations by a plan administrator or utilization review agent. Thus, upholding the other provisions of the Act is consistent with the legislative intent. Moreover, where the invalid sections of an act may be separated, the Court "must do so and not permit the invalid part to destroy the whole." In re Johnson, 554 S.W.2d at 787. Therefore, since the Act can still be given effect without these sections, the Court finds that they may be severed from remainder of the Act.

### iii. Binding Employers or Plan Administrators to Particular Choices

The Court agrees with Plaintiffs' next argument that, under existing Fifth Circuit authority, certain provisions in the Act bind employers or plan administrators to

particular choices. In *CIGNA*, the Fifth Circuit held that the statute had a connection with ERISA plans because it required "ERISA plans to purchase benefits of a particular structure when they contracted with organizations like CIGNA and CGLIC." 82 F.3d at 648. The Court reasoned that:

> ERISA plans that choose to offer coverage by PPOs are limited by the statute to using PPOs of a certain structure—i.e., a structure that includes every willing, licensed provider. Stated another way, the statute prohibits those ERISA plans which elect to use PPOs from selecting a PPO that does not include any willing, licensed provider. As such, the statute connects with ERISA plans.

*Id.* Futhermore, the Court found that it was "sufficient for preemption purposes that the statute eliminate[d] the choice of one method of structuring benefits." *Id.; cf. Dillingham,* 519 U.S. at ——, 117 S.Ct. at 842 (holding that prevailing wage statute is not preempted by ERISA because statute merely "alters the incentives ... but does not dictate the choices, facing ERISA plans").

Later, in *Texas Pharmacy Ass'n v. Prudential Ins. Co. of Am.,* the Fifth Circuit relied on its opinion in *CIGNA* and determined that Texas's Any Willing Provider statute was preempted by ERISA. 105 F.3d at 1037. The Court explained that "[a]s with the Louisiana statute at issue in *CIGNA*, the Texas statute relates to ERISA plans because it 'eliminates the choice of one method of structuring benefits,' by prohibiting plans from contracting with pharmacy networks that exclude any willing provider." *Id.* (citing *CIGNA*, 82 F.3d at 648).

Based on the Fifth Circuit's holding in *CIGNA* and *Texas Pharmacy*, the Court finds that the Act creates two provisions that bind employers or plan administrators to particular choices-Sections 88.002(f) and (g) of the Texas Civil Practice and Remedies Code.[15] Section 88.002(f) provides that:

> [a] health insurance carrier, health maintenance organization, or managed care entity *may not remove a physician or health care provider from its plan or refuse to renew the physician or health care provider* with its plan for advocating on behalf of an enrollee for appropriate and medically necessary health care for the enrollee.

TEX. CIV. PRAC. & REM. CODE ANN. § 88.002(f) (West 1998) (emphasis added). Section 88.002(g) states that:

> [a] health insurance carrier, health maintenance organization, or managed care entity *may not enter into a contract with a physician, hospital, or other health care provider or pharmaceutical company which includes an indemnification or hold harmless clause* for the acts or conduct of the health insurance carrier, health maintenance organization, or other managed care entity. Any such indemnification or hold harmless clause in an existing contract is hereby declared void.

*Id.* § 88.002(g) (emphasis added).

Thus, in the instant case, ERISA plans that choose to offer coverage by either a health insurance carrier, HMO, or other managed care entity are limited by the Act to using an entity of a certain structure—i.e., a structure that does not remove a physician or health care provider from its plan for advocating on behalf of an enrollee for appropriate and medically necessary health care and a structure that does not include a prohibited indemnification or hold harmless clause. In other words, the Act prohibits

---

**15.** Plaintiffs also argue that Section 88.002(b) of the Texas Civil Practice and Remedies Code, as added by the Act, "purports to transform the independent contractor relationship [it has with certain providers] into one of agency, express or implied, in contravention of the express terms of the contract." (Plaintiffs' Motion, Instrument No. 20 at 17). Under Section 88.002(b), the named entities are held liable for a negligent health care treatment decision made by its employees, agents, ostensible agents, or other representatives. TEX. CIV. PRAC. & REM. CODE ANN. § 88.002(b) (West 1998). To the extent that certain providers are independent contractors, not agents of the HMO, then the court should address that concern on a case-by-case basis. Other suits against a managed care entity for vicarious liability, such as those based on the conduct of an HMO's employee, are still viable. Furthermore, even assuming that Plaintiffs' argument is valid, this consequence does not deny the named entities the right to structure their benefits in a particular manner—they still have the option to employ providers only as independent contractors.

ERISA plans from using a managed care entity that does not conform to the requirements in these provisions. By denying health insurance carriers, HMOs, and other managed care entities the right to structure their benefits in a particular manner, the Act effectively requires ERISA plans to purchase benefits of a particular structure when they contract with organizations like Plaintiffs. *See CIGNA,* 82 F.3d at 648.

▮ Since these provisions require ERISA plans to purchase benefits of a particular structure they essentially cause the Act to have a "connection with" such plans.[16] However, the Court finds that these provisions may be severed from the remainder of the statute.

Although these provisions at issue would clearly serve to enhance the quality of care that could be provided, the absence of these sections from the Act does not affect the otherwise valid provisions concerning quality of care. A suit may still be brought under the Act challenging the quality of a benefit actually received. Moreover, upholding the validity of the remainder of the Act is in accord with the legislative intent. The floor debates as well as the testimony, in support of the Act, given before the Senate Interim

Committee on Managed Care and Consumer Protections and the Senate Economic Development Committee reveal the proponents' and the legislature's concern over managed care entities and the lack of quality care. (Index of Legislative History, Instrument Nos. 14, 16). Even though these provisions clearly were designed to promote quality medical care, this goal care be given effect without these invalid provisions and accordingly, the Court finds that they may be severed from the Act.

**iv. Alternate Enforcement Mechanism**

Lastly, Plaintiffs argue that the liability sections created by the Act, Sections 88.002(a) and (b) of the Texas Civil Practice and Remedies Code, purport to create an alternate enforcement mechanism. (Plaintiffs' Surreply, Instrument No. 53 at 6).

▮ State laws that provide "alternate enforcement mechanisms [for employees to obtain ERISA plan benefits] also relate to ERISA plans, triggering pre-emption." *Travelers,* 514 U.S. at 658, 115 S.Ct. at 1678; *Coyne,* 98 F.3d at 1468 (noting Congress' intent to preempt state laws that provide alternate enforcement mechanisms for employees to obtain ERISA plan benefits). In

---

**16.** The decisions in *CIGNA* and *Texas Pharmacy* clearly hold that these type of provisions have a connection with ERISA plans. Thus, as stated by the Fifth Circuit in *Texas Pharmacy,* this Court notes that "a different result will require further guidance from the Supreme Court or further action from Congress." 105 F.3d at 1040.

A recent district court case from Massachusetts, however, noted that "where a third-party, such as a carrier, provides administrative services for a plan, it is critical to distinguish between the carrier's administration of the ERISA plan and 'its own administration of its business.' " *American Drug,* 973 F.Supp. at 68. In *American Drug Stores, Inc. v. Harvard Pilgrim Health Care, Inc.,* the Court determined that Massachusetts' Any Willing Provider statute did not have a connection with ERISA plans because it did not mandate employee benefit structures or administration. *Id.* at 69. The Court, therefore, found that the statute was not preempted by ERISA. *Id.* The Court reasoned that "the organization and offering of restricted pharmacy networks should be seen as part of the carrier's own administration rather than its administration of ERISA plans." *Id.* at 68. The Massachusetts statute, the Court continued, "did not concern administrative and structural matters central to

the administration of ERISA plans themselves." *Id.* Furthermore, even more recently, in *Washington Physicians Serv. Ass'n v. Gregoire,* 147 F.3d 1039, 1045 (9th Cir.1998), the Ninth Circuit stated that:

> [t]he mere fact that many ERISA plans choose to buy health insurance for their plan members does not cause a regulation of health insurance to automatically 'relate to' an employee benefit plan—just as a plan's decision to buy an apple a day for every employee, or to offer employees a gym membership, does not cause all state regulation of apples and gyms to 'relate to' employee benefit plans.

Although the Courts in both *American Drug* and *Washington Physicians* present convincing arguments, this Court must find that Sections 88.002(f) and 88.002(g) of the Texas Civil Practice and Remedies Code have a connection with ERISA plans in light of current Fifth Circuit authority. A different result will require Congress to act on the promise to ensure that " ' [n]o human being in need of legitimate care should be stopped from getting it.' " Larry Lipman & Rebecca Carr, *Rival Bills Aim to Heal HMO Issues,* ATLANTA J. & ATLANTA CONST, July 17, 1998, at A1 (quoting a statement made by House Speaker Newt Gingrich at the George Washington University Medical Center).

this case, the Court has already determined that the liability sections of the Act, namely Sections 88.002(a) and (b) of the Texas Civil Practice and Remedies Code, provide a cause of action for challenging the quality of benefits received. Such a lawsuit would not create an alternate enforcement mechanism for employees to obtain ERISA benefits. *See Dukes,* 57 F.3d at 360–361 (distinguishing between an HMO's denial of plan benefits and an HMO's role as the arranger of a participant's medical treatment which implicates the quality of care that a participant receives). Rather, it would ensure the quality of care that employees actually receive. Whether a claim seeks a review of an adverse benefit determination or to secure quality coverage should be determined by the Court on a case-by-case-basis. *See Schmid,* 963 F.Supp. at 945 n. 1 (noting that a "determination of whether or not a particular claim is preempted by ERISA must be made on a case-by-case basis"). It is not apparent to the Court that every claim that may be asserted under the Act would establish an alternate enforcement mechanism for benefit determinations.

Based on the foregoing analysis, the Court holds that Plaintiffs have not met their burden of proving that every claim brought under the Act would be preempted by ERISA. Even though some economic impact may result, a claim concerning the quality of a benefit actually received would remain valid.

## VII. FEHBA Preemption

 Plaintiffs finally argue that the Act is preempted by FEHBA. In response, Defendants maintain that "FEHBA preemption applies only when there exists a conflict between the particular state law being relied upon in litigation and contractual provisions in a FEHBA policy 'which relate to the nature or extent of coverage of benefits.'" (Defendants' Brief, Instrument No. 11 at 36). According to Defendants, Plaintiffs fail "to set forth any facts alleging any particular FEHBA policy or contract language conflicting with" the Act. (*Id.*).

Conversely, Plaintiffs argue that FEHBA preemption is required given the Fifth Circuit's decision in *Burkey v. Gov't Employees*

*Hosp. Ass'n,* 983 F.2d 656 (5th Cir.1993). Plaintiffs contend that Defendants' argument, raised by the plaintiffs in *Burkey,* was clearly rejected by the Fifth Circuit.

As with ERISA, FEHBA provides that state law may be preempted. However, "FEHBA preemption is far more narrow than that of" ERISA. *Arnold v. Blue Cross & Blue Shield of Texas, Inc.,* 973 F.Supp. 726, 732 (S.D.Tex.1997). Congress expressed its intent to pre-empt state law under FEHBA in 5 U.S.C.A. § 8902(m)(1) (West Supp. 1996), which states that:

> [t]he provisions of any contract under this chapter which relate to the nature or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or regulation issued thereunder, to the extent that such law or regulation is inconsistent with such contractual provisions.

This language makes it clear "that Congress did not intend for state law to be entirely preempted." *Arnold,* 973 F.Supp. at 731.

> By expressly limiting the FEHBA's preemptive effect to those laws or regulations that are inconsistent with insurance carrier [or health plan] contracts, Congress indicated that courts may not assume that the FEHBA preempts all related state law claims but must instead conduct a case-by case analysis to determine whether a plaintiff's state law claim conflicts with a contractual provision.

*Id.* at 732 (citing *Transitional Hospitals Corp. v. Blue Cross & Blue Shield of Texas, Inc.,* 924 F.Supp. 67, 70 (W.D.Tex.1996)). "The policy underlying § 8902(m)(1) is to ensure nationwide uniformity of the administration of FEHBA benefits." *Burkey,* 983 F.2d at 660.

In *Burkey,* a federal employee and her son brought an action against the Government Employees Hospital Association ("GEHA") under Louisiana law "which authorize[d] damages and attorneys' fees for unreasonable delay in paying health and accident insurance claims." 983 F.2d at 657. The Burkeys claimed that GEHA breached its contractual obligation to pay the son's medical bills.

The Fifth Circuit held that "Louisiana's penalty provision [wa]s inconsistent with and therefore preempted by the federal law regulating federal employee health benefits." *Id.* at 657–58. Although the Burkeys argued that their state law claim related to remedies, not the "nature or extent of coverage or benefits[,]" the Court reasoned that "tort claims arising out of the manner in which a benefit claim is handled are not separable from the terms of the contract that governs benefits ... [Therefore] such claims 'relate to' the plan under § 8902(m)(1) as long as they have a *connection with or refer to* the plan." *Id.* at 660. "Insofar as the Burkeys' claim for statutory delay damages necessarily refer[red] to GEHA's plan to determine coverage and whether the proper claims handling process was followed, it refer[red] to the plan, 'relate[d] to' it and [wa]s therefore preempted." *Id.*

Unlike the claim asserted by the Burkeys, an individual may file suit under the Act seeking damages for the substandard quality of care actually received. As articulated by the Court under the ERISA preemption analysis, such a suit would not arise out of the manner in which a benefit claim was handled and would not refer to Plaintiffs' plan to determine coverage or whether the proper claims handling process was followed. Therefore, even under *Burkey,* a claim addressing the quality of a benefit received would not "relate to" a FEHBA plan. Moreover, with respect to other claims that one may bring under the Act, a court should conduct a case-by-case analysis to determine whether that claim conflicts with a contractual provision. *See Arnold,* 973 F.Supp. at 732.

## VIII. Conclusion

Accordingly, the Court finds that Defendants' and Plaintiffs' motions for summary judgment are **GRANTED in part** and **DENIED in part.** (Instrument Nos. 10 and 20).

**17.** The Court did not sever Section 88.001(1), the definition of appropriate and medically necessary, from the Act. Given the severance of the mentioned provisions, the inclusion of this definition does not cause the statute to relate to an ERISA plan. It is simply an unnecessary definition because the term was only referenced in Section 88.002(f), which was removed. As such,

The Court **ORDERS** that the Department is dismissed from the lawsuit.

The Court also finds that the following provisions are preempted by ERISA and accordingly, the Court **ORDERS** them to be severed: Section 88.002(f), Section 88.002(g), Section 88.003(a)(2), Section 88.003(b), Section 88.003(c), the relevant language in Section 88.003(d), Section 88.003(e), and the relevant language in Sections 88.003(f) and (g) of the Texas Civil Practice and Remedies Code, the language added by the Act in Article 20A.09(e)(4), Article 20A.12A, the amendments to Articles 21.58A(6)(b)(5) and 21.58A(6)(c), Article 21.58A(6A), Article 21.58A(8)(f), and Article 21.58C of the Texas Insurance Code.[17]

The Court finds that the remaining provisions of the Texas Civil Practice and Remedies Code and the Texas Insurance Code, as added and amended by the Act, are not preempted by ERISA.

The Clerk shall enter this Order and provide a copy to all parties.

it could be easily removed without effecting any other provisions in the Act. However, Texas law provides for severance of invalid provisions, not unnecessary provisions. So, the Court declined to remove that section simply because it would produce a clearer, more concise statute. This matter will be left to the decision of the legislature.